Howry, J.,
delivered the opinion of the court.
This controversy had its origin in a treaty between the United States and the Chickasaw Nation, May 24, 1834, known as the treaty of Washington (7 Stats., 450) amenda-tory of a treaty of October 20, 1832 (Ibid., 382), known as the treaty of Pontotock. The Chickasaws by the original treaty ceded to the United States all their lands east of the Mississippi River, including that upon which they lived. Title became vested in the United States, reserving to each family in the Chickasaw Nation a temporary right of occupancy. When homes were found and the Chickasaws could remove to the West their occupancy of the lands in Mississippi was to cease and the lands were to be sold by the United States not for the benefit of individuals, but for the use of the nation.
This Pontotock agreement was materially changed May 24, 1834. The amended treaty provided for the reservations in fee thereinafter to be admitted under its fifth article after enrollments by the chiefs of the Chickasaw Nation, and under its sixth article after enrollments by a committee of seven persons. When these decided upon the claim of an individual, his or her name was to be enrolled upon a list and within a reasonable time filed with the agent, upon whose certificate of its believed accuracy the register and receiver were required to make the location. Treaty shows on its face that it was made for Chickasaws then “ about to abandon their homes.” Rights to reservations pertained to those who before the treaty had intermarried with the Chickasaws resident, however, in the nation.
Pursuant to the last treaty residents obtained locations. The Indian Office exercised supervision over the lists and locations under regulations.
After the removal of the Chickasaws to their new homes, attempts Avere made by three of the seven commissioners who were to make up the lists to enroll persons not residents of Mississippi when the treaties Avere executed, but who, it is claimed, were Chickasaws residing with the Choctaws in the West. The Chickasaw agent doubting the accuracy of the lists and not being present cooperating with the three com *389 missioners undertaking to make these enrollments*, and seeing that the lists had not received the sanction of the body of commissioners, transmitted the rolls May 4, 1839, to the Indian Office for examination. After some delay and on information that the attempt to list and enroll Indians in the Choctaw country as Chickasaws was inspired by whites speculating at the expense of the nation, and in the belief that fraud was being practiced and mistakes were being made in listing persons not entitled to land for purposes of location, the Secretary of War ordered an investigation. The result did not establish that the persons attempted to be enrolled were entitled to locations; and as the commissioners named in the treaty took ho official action, and the Chickasaw agent made no certificate of accuracy as the treaty also required, the Secretary made a decision against the right of the persons attempted to be enrolled to locations.
The United States then sold the lands (between 1843 and 1846) under Article XI of the treaty of Washington, which stipulated that after the reservations provided should be located the residue of the Chickasaw country in Mississippi should be sold as public lands and the net funds invested, out of which the interest arising therefrom was to be annually paid to the Chickasaws. Patents issued to the purchasers and they entered into possession. But 33,900 acres had in the meantime been located to Chickasaws who were found to be members of the tribe and parties entitled, but who did not obtain their reservations before the exodus of the tribe in 1831.
The claim now is for the value and proceeds of the land sold, to which Eli Ayres claimed to have title by purchase from those persons who endeavored to secure locations, but whose locations were never made as required by the treaty, and who on account of the fraud and mistake charged in the matter of the attempted enrollment had been found not to be entitled to reservations. The authority for this proceeding is a provision contained in “An act for the allowance of certain claims reported by the Court of Claims, and for other purposes,” approved February 24, 1905 (33 Stat. L., 808), by which jurisdiction is given to inquire into title to the land *390 and the loss alleged to have been occasioned to Ayres by its appropriation. Reimbursement is claimed of and from the Chickasaw Nation trust funds, or from the United States, for the sum of $191,444.70, and from the United States alone the sum of $42,000 for the land alleged to have been appropriated and located to Chickasaws found to have been entitled.
It is alleged in the petition that Ayres acquired title in 1839; that the Government sold 141 sections of the land, placing the proceeds to the credit of an appropriation carrying into effect the treaty of the Chickasaws under the act of April 20, 1836 (5 Stat. L., 10), and located “about” 53 sections to others. The Chickasaw Nation (claiming to have been .without knowledge of the proceeding until after the passage of the act) has been admitted to defend. United States also defend; and both deny the legality and sufficiency of the enrollments and deny title to the land by those whose names appear upon what is designated as tentative lists; deny the conveyances; deny purchases by Ayres; and deny all equities, not only because the treaties were not complied with, but because the alleged purchases were never made, or, if made, that no title was acquired.
The act conferring jurisdiction requires the court to find, according to the principles and rules of both law and equity, the facts as to the purchase of the land from the Chickasaw Indians by Ayres; as to the deeds received by him and the amounts paid; as to the title of Ayres; the alleged appropriation by the United States of the land, and all other material facts embracing the amount that should be paid to the representatives of the deceased Ayres by reason of the loss occasioned to him, if any, resulting from the appropriation by the Government of the land; the court being authorized to find other facts of importance and then to report to Congress.
The demand is without remedy as against the land under the law of property where it is situate. If any right ever accrued to any Indian under any kind of a location, such right has long since been lost as against those who went into possession. (Laws of Miss., 1839; ib., 1848.) Indian reservees become subject to the.same bar created by adverse possession as other persons. (R. R. Co. v. Moye, 10 G. Miss., 374.)
*391 Though the dust of sixty-eight years has gathered over the claim, the jurisdictional act is so framed as to re-create rights once supposed to exist and no longer operating on the land itself, but possibly affecting its proceeds-now in the Treasury. Treating the jurisdictional act as designed to determine a title which once may have had an existence, although not now enforceable against the soil, the court has made its findings on the theory that the jurisdictional act does not carry the admission that there is any merit in Ayres’s claim or that he ever had a title, but calling for a report as to whether a legal or equitable title to the lands ever existed in Eli Ayres, with a resulting judgment in money in favor of his representatives upon condition only that the legal or equitable title has been shown and for such amount as is established by the proof to have been paid for the land.
The primary inquiry is the acquirement of any interest in the land by the alleged Indian reservees. The next is to find such right in Ayres as to entitle him to reimbursement, because, even with undisputed reservations properly located for the Indians, Ayres must have acquired something from them which he could call a legal or an equitable title, not only as against them but against those persons who, purchasing-under the United States, obtained patents and went into possession and against those other Indians who in the meantime had been properly located under the treaty.
There is no testimony from the original parties most interested. The alleged Indian reservees do not seem to have ever spoken to the matter. The persons who attempted to make the locations have passed away without explaining the matters in dispute except as such explanations were originally transmitted. Eli Ayres is dead and Niles, his partner in much of the business, appears not in any kind of statements. Ayres himself seems to have been silent, except as to a few ex parte statements. There is no explanation as to why steps were never taken by him to make available his rights except such as we gather from the presentation of two conveyances and an unauthenticated list to the authorities at the seat of government and such as arise from an effort in 1876 to have some kind of action taken.
*392 The record is most elaborate and full of perplexing detail. Outside of official reports there is very little evidence of any essential value. While the jurisdictional act directs the court to consider affidavits of persons now dead and ¿11 papers on file along with the official matter in determining the merits, the weight authorized to be given to these ex parte statements is diminished, in that they are not contemporaneous with the transactions. But into this labyrinth of official statement, speculation, and opinion, and with very little of a character that could be classed as competent in the ordinary .administration of justice, and with no cross-examination appearing anywhere to anything, the court has reviewed the record from everything in hand and reached conclusions as best it could.
It is now admitted by tlie claimants that Ayres never had a legal title. The record disclosing no legal title in him, and the issue being narrowed to the claim for an equitable title, the court must be governed by rules which prevail in courts of equity. It is not the practice in courts of equity to make findings of fact, but to summarize the results in the form of a decree. Supreme court rules governing this court provide for conclusions of law by statements separate from the facts in law cases only. These rules have no application where the court is required to exercise equity jurisdiction. (Harvey v. United States, 105 U. S., 671.) No necessity to state the ultimate facts in the nature of a special verdict exists, but as the jurisdictional act requires the report of a conclusion as to what amount should be paid, if any — which is the essence of judgment — the court has made findings as if the case were at law. Intimately blended with the findings are legal questions necessary to be stated to make clear the facts. Hence this opinion.
The adjudicated cases show that the term “ reservation ” in the treaty was equivalent to a grant; but location was yet required, the .grant raising the presumption only that the incipient steps required to give it validity had been taken. (Best v. Polk, 18 Wall., 112, citing Polk’s Lessee v. Wendell, 5 Wheat., 293; Bagnell v. Broderick, 13 Pet., 436.) The treaty did not mean that any Indian improperly located had *393 an interest in the land. It did mean that anyone holding the certificate of the register acquired evidence of title. With such a certificate the presumption was that the location was proper, but this presumptive right was open to inquiry. So, any Indian appearing by certificate, regular upon its face, to have been located but out of possession could have brought his action of ejectment; or, being in possession, could have stood on the presumption created by his certificate that all the preliminaries necessary to entitle him to a location had been fulfilled until such presumption by evidence aliunde the certificate was overthrown.
The first steps looking to the establishment of the rights of the persons from whom Ayres’s claims were taken in 1838 in the form of statements of certain Chickasaw commissioners who had gone West, supplemented by statements from some of the Choctaw chiefs, who were outside of the treaty and had nothing to do' with the matter except as volunteers. These statements were made on papers to which the customary certificates of the commissioners designated by the treaty to make up lists of reservees were not appended. They are dated May 8, 1838, June 7, 1838, and June 24, 1838. Without the certificates also required by the treaty of believed accuracy from the Chickasaw agent, that official on May 4,1839, transmitted the statements to the Commissioner of Indian Affairs for the examination of the President. Thus, the initial movement was six years after the treaty of 1832, four years after the treaty of 1834, and nearly two years after the Chickasaw residents in Mississippi had obtained reservations, closed their affairs in that State and removed to their new homes.
The persons whose names were listed upon these insufficient statements had been removed under the Dancing Rabbit Creek treaty of 1830 between the United States and the Choctaw Nation and were living with the Choctaws. Presumptively these people were Choctaws. It is certain that they emigrated with the Choctaws and resided with that tribe for a number of years before May and June, 1838, because the certificates of the Choctaw chiefs relied on to sustain the insufficient Chickasaw certificates establish the fact. Un *394 doubtedly the transactions occurred'.west of the Mississippi River in the present Indian Territory. It does not appear that any of the alleged reservees returned to the State of Mississippi. There is no evidence to show that any of them ever attempted to take possession of the reservations sought to be given to them. The Chickasaw agent confirmed the statement of their Choctaw location by saying in forwarding the incomplete roll on which their names appeared that they emigrated west sometime before the rolls were forwarded.
■ Reservees under the fifth article of the treaty were-to be listed by the chiefs of the Chickasaw Nation, under article 14 of the treaty of 1832, “ with the advice and assistance of the agent;” and reservees under the sixth article by the committee of seven persons named in article 4 of the treaty of 1834, and these lists were to be “ filed with the agent, upon whose certificate of its believed accuracy ” the register and receiver was required to act. In making up the lists the chiefs or commissioners were to act with the Chickasaw agent, and the agent with them, each cooperating with the other in the preparation of the lists and joint action being necessary to give them validity. An examination of these lists discloses that the requirements of the treaties were not certified to by the required persons. It further appears from the official letter of the agent himself that the incomplete certificates with the lists attached never received the action made necessary by the treaty to give them validity.
The certificates upon which claimants rely contain the names of some of the commissioners west of the Mississippi. To the first list the names of three appear; to the next only two, and to the next only one. There is no evidence to establish the fact that these are the certificates which were in fact attached to the list of persons claimed to have been sixth-article grantors of Ayres, but they are the only purported certificates before the court. They fail to show that the treaty was complied with, and, on the other hand, do affirmatively show that the requirements of the treaty were not complied with. This is likewise so as to the alleged enrollment of the persons claimed to have been fifth-article reservees. The certificate which purports to certify that certain claimants were *395 Chickasaws is irregular in that it' contains the names of some of the Chickasaw commissioners, but is signed by the chiefs and captains of the Choctaw Nation residing west of the Mississippi.
In forwarding these lists to the Commissioner of Indian Affairs the Indian agent wrote from Memphis, Tenn., May 4, 1839, that he had the honor to transmit for examination “ an original roll of the Chickasaw Indians who had emigrated West; ” that it was signed by all the commissioners who were in the West, and that he, the agent, presumed that they had examined the claims strictly and were perfectly satisfied with the justness thereof. The agent also transmitted proofs from the Choctaws. Prompt action was requested to enable the agent to go west. That this was not an approval by the Indian agent of the lists is made clear by an inspection of the originals. The agent did not append his certificate to the lists that they were accurate. Properly enough he postponed the exercise of the power conferred upon him by the treaties until instructed by the Department, and when it is considered that the agent was not present with those of the commissioners (who assumed to act for all) in making up these lists, but was some hundreds of miles distant and knew nothing about it except what the lists and accompanying papers disclosed, it is manifest that the lists had no validity. They never had any for want of his certificate.
Soon after these lists were transmitted for examination rumors reached the Government that the lists had their origin in the efforts of white men to procure land from the Indians. Fraud and mistake were alleged with reference to not only the matter now before the court, but likewise respecting other lists then being forwarded for examination. In consequence the Commissioner of Indian Affairs recommended an investigation, upon which the Secretary of War transmitted the lists and accompanying papers to the acting superintendent of Indian Affairs, with directions to refer the matter to the same committee provided for in article 4 of the treaty of 1834. According to the contention of the claimants, the committee referred to consisted at that time of the king and the six chiefs or head men named in article 4; that the committee named in article 4 consisted of Ish-to-ho-pa, *396 the king, Levi Colbert, George Colbert, Martin Colbert, Isaac Alberson, Henry Love, and Benj. Love. Thus, the persons who were given power to investigate, so as to enable the agent to certify to the necessary accuracy, were the same joersons who by the treaty were to make up the lists. The full number were called on to act where only some of them had acted before.
This was in 1841. Superintendent Armstrong took about eighteen months, with the aid of such testimony as he could obtain, to make his investigations in the locality where the Chickasaws had found their new homes. He called a council of Indians. It does not appear that all of the commissioners were present, but that Ish-to-ho-pa, the king, and two other of the commissioners mentioned in article 4 were present with other leading Chickasaws. It was' stated by the Indian agent that the council was composed of the leading men of the tribe. The findings show the full particulars of the means employed to prove or disprove the correctness of the lists; the efforts made to arrive at the truth; the proceedings of the council mentioned, and all the circumstances relating to the right of enrollment.
October 28, 1842, the superintendent made his official report. This report and the subreport, adopted by the king of the Chickasaws, two of the commissioners, and leading members of the tribe, received the approval of the President, from which it appears that the original lists were unlawful, and there the matter ended for years. But meantime white men, including Ayres, had been making bargains with the alleged reservees, Ayres having gone west from Mississippi, where he resided, for that purpose.
Although no Indian objections were offered for setting aside the decision the case now becomes complicated by the action of the local register of the land office at Pontotoc. Six years after the action of the Secretary of War and after the land had been patented this local register on the last day of his official life (March 2, 1849), certified to papers containing names of these parties and locations of land to them by saying that the list was a true copy of the roll, number, reservees, and locations furnished to him by the Chickasaw agent as Indians entitled under the treaty, concluding by *397 saying “ as the same remains of record in my office.” Few of the dates are given as of 1839,-but most of the alleged dates of locations were withheld. All these certificates, delivered to Eli Ayres, raised the presumption (no more) that the forms of the treaty had been complied with. Though not based on the action of the full body of commissioners and the agent according to anything original on file these certificates were in conflict with patents then outstanding from the United States under another provision of the treaty. This curious state of affairs raised different presumptions concerning title.
When once a patent is issued, a right of property may become vested by a decision of the Land Department of which the applicant can not be deprived except upon direct proceedings and of which he has notice. (Michigan Land and Lumber Company v. Rust, 168 U. S., 589.) In the absence of fraud or imposition the findings of the Land Department on matters of fact are conclusive upon the courts. But error in matter of law is open to inquiry. (Love v. Flahive, 205 U. S., 195.)
Mississippi courts were then open to assert treaty rights of location if any existed. Presumptions arising from the certificates and presumptions arising from the patents conflicted, and the real right became open to inquiry. But those holding the patents were in possession, and it was incumbent upon those out of possession with proper locations to assail the patents. Before and about that time a few ejectments had been instituted, under which it is contended that Ayres stood upon the same footing with those who obtained relief on the faith of similar register’s certificates. (Wray v. Doe, 10 Smed. & Mar. Miss., 461; Hardin v. Ho-yo-po-nubby, 27 Miss., 582.) This contention is inconsistent with the present Ayres claim, because Ayres never had a legal title. (27 Miss., 582.) Whatever title he had was derived from the legal title supposed to exist in the Indian, who, however, could not make a valid conveyance except upon conditions to be noted.
In those cases ejectment was instituted against persons in possession of land as purchasers at public sales to whom the Government had issued patents. Actions were instituted on behalf of a person claiming to be a Chickasaw Indian and *398 for whom the land in controversy was located under the sixth article of the treaty of 1834. As showing title of the alleged Indian, the certificate of the register, showing that the lands in controversy were reserved and set apart for him, was offered in evidence. The objection of the defendants was overruled on the ground that such a certificate was held to be competent evidence to establish the location. Defendants in those proceedings then asked the court to require the alleged Indian to show that all of the preliminary steps leading up to the location required by the two treaties with the Chickasaws had been regularly taken. The court held that the filing of the certificate of the register, showing the location of the lands raised a presumption that the preliminary steps required by the treaty had been taken. There being no other evidence, the cases were decided against defendants. None of the facts' touching the frauds charged in procuring reservations and the alleged illegal enrollments were offered in evidence. The preliminary steps leading up to location were not considered for want of proof. As the certificate was in form the court held that it. had precedence over the subsequent patent.
These cases were followed in Best v. Polk (18 Wall., 112), which was likewise governed Toy presumption of regularity raised by the register’s certificate. That also was an action at law, the only difference from the other cases being that Brown, who held a patent, had conveyed to Polk, who found Best in possession of the land and sued in ejectment to oust Best. The only proof before the court was the patent and the certificate of the register of the land office at Pontotoc, showing that the reserve of the Indian was located on the disputed section. There was no opportunity for the defendant to connect himself with the Indian title after the court refused to let the evidence on the subject of title go to the jury. In holding the certificate of the register competent the court said, however, that:
“ If the location were not as there stated it was easy to show that fact. * * * If, therefore, the location of the land in controversy was properly made, the legal title to it was consummated and the subsequent patent was unauthorized.”
*399 In all of these cases the presumption was raised by the certificate of the register that the preliminary steps required by the treaty had been taken. Want of proof relative to the alleged illegal enrollment of the reserves left the court the simple duty of applying the presumption of regularity and giving effect to the grant contained in the treaty in favor of those who were made to appear by the certificate to have been entitled.
If upon any contest in ejectment proceedings it would have been competent to have shown error in locations sufficient to defeat an action at law, it would have been equally competent to have shown everything included in securing the locations contrary to the law of the treaty. The right claimed by virtue of a certificate of location was prima facie established, but subject to be disproved. But no effort was made in the few actions instituted to impeach the certificate.
The certificate if false might have been impeached, because proof of that kind of a fraud would have been competent upon the familiar principle that fraud vitiates everything into which it enters. The certificate was no more sacred than the judgment of a court of competent jurisdiction, which, like anything else fraudulent, was subject to be set aside.
Probably none knew the futility of instituting proceedings on the faith of these certificates better than Ayres, for among many lawyers whose able briefs appeared about that time on questions arising under this treaty some represented Ayres and Niles as well as Indians who held the same kind of certificates shown here. The inquiry naturally arises, Why rights now so dim should not have been the subject of judicial inquiry if there was anything to assert? a
*400 We think the reason is at hand. The record shows that the original lists certified to this court did not conform to the law governing locations under either the fifth or sixth article, which fact controlled the agent in refusing his own certificate. True, the locations might have been made upon the return of the list to the agent by the chiefs under the fifth article and by the commissioners under the sixth article, and this list may not have been deposited wih the register until after the return of the list to the agent. But a genuine list must have existed in original form and been deposited with the agent before the register could act upon his separate certificate. (Harden v. Ho-yo-po-nubby’s Lessee, 27 Miss., 582.) Unless there was an original list in existence prepared by the chiefs and commissioners designated, locations would have been improper, because the agent could not give the requisite certificates of believed accuracy until the original schedules had been actually filed with him preliminary to his action as agent. We have already seen that the original lists never conformed to the treaty and that these originals were transmitted to Washington. If the agent gave certificates and misled the register, locations were not made according to law, because under the decisions the agent had no authority to usurp the functions vested in the bodies designated to make- the lists. If the register issued these certificates without the genuine signature of the agent to something indicating that the lists according to the treaty had been filed with him and that he believed in their accuracy, the register had no authority to act and the legal title of the reservees did not become consummated.
These certificates differ from those given to Chickasaw residents in that they purport to be a true copy of lists “ furnished by the Chickasaw agent.” Previous certificates appear to have been predicated upon true copies “ from the lists of persons furnished by Benjamin Reynolds, Chickasaw agent,” on a particular day. Reynolds was one of the commissioners designated to make certain locations, and he retired from office March 3,1839, and was succeeded by another agent March 7, 1839. Reynolds’s official action, both as commissioner and as agent, is wanting. His certificate appears neither to the original rolls as one of the commissioners *401 making up the lists nor in the form of the necessary agent’s certificate.
A violation of duty on the part of officers responsible for the locations ought not to be presumed, but this court is constrained to hold that the certificates relied on as consummating title in the reservees from whom Ayres claims are not sustained by the action of the commissioners or chiefs and the agent. The findings show the facts.
The equity jurisdiction here conferred makes it the imperative duty of the court now to review the sources of the titles involved, regardless of certificates. This carries us back to the right of the Secretary of War to pass upon the matters referred to him respecting locations and sales and to everything upon which the Department founded its action.
This action had the effect of causing the Government to loegte 53 sections to Chickasaws claiming to be entitled as parties to the treaty, in place of those under whom Ayres claims, and to put 141 sections on the market under that provision of the treaty which required the Government to sell for the nation after all locations were made. Thus this departmental action settled titles to 164,000 acres for a period now covering sixteen or eighteen administrations. Considering that there were 520 Indians listed, but not properly certified by the chiefs, commissioners; and agents, of whom 150 were also western Indians accredited to another tribe- — • the same 150 from whom Ayres claims — the burden of proof rests upon those who now seek to overthrow the administrative decision as to the facts found if the Department had jurisdiction to take any part in the matter.
It is said'that the Secretary had no right to investigate. This objection relates more to a regulation prescribing the mode of executing the treaty than to the matter now in hand. The President’s regulation provided that lists of all the locations, except under article 8, should be transmitted, after the same were made, to the General Land Office by the register, but that no location would be considered as final or as conferring any right until approved by the President.
It is not necessary to consider the holding of some of the courts that this was in conflict with the treaty, because in this *402 matter the locations had not been made by the authorities charged with that duty. Locations being only in process of ascertainment, it is difficult to see why the Department should, not undertake to investigate that about which the agent had his doubts, especially as it appeared that the commissioners, chiefs, and agents had not undertaken to exercise their powers.
The Department had as much authority to investigate °a matter not closed by the certificate of the agent as the agent himself, when requested by the agent to pass upon the matter. The head of the Department would have been derelict in his duty had he not undertaken to have made certain that which the agent left uncertain. It does not appear, if the President’s regulation were void, that the necessary steps had been taken by the requisite number of commissioners and chiefs and the agent to consummate title, and until title was actually consummated by their action there was no interference with their powers. The Secretary annulled nothing. The Secretary of War then had supervision of the Indians by law and it became his duty to see that the treaty was executed. The act of July 9, 1832, then in force (4 Stats., 564), provided that—
“ The Commissioner of Indian Affairs shall, under the' direction of the Secretary of War, and agreeably to such regulations as the President may from time to time prescribe, have the direction and management of all Indian affairs and of all matters arising out of Indian relations.”
Commenting upon the official prerogative of the Secretary having charge of Indian affairs under similar statutes (secs. 441, 463, K.. S.) to decide the point of citizenship in a tribe, Mr. Justice Holmes quite recently declared that the primary decision must come from the official exercising supervision and that the Supreme Court would “ hesitate a good deal before saying that the language used was not broad enough to warrant a regulation obviously made for the welfare of the rather helpless people concerned.” (United States ex rel. West v. Hitchcock, 205 U. S., 80.) Besides the general power under these statutes to prevent improper locations, the United States, as trustee, became obligated by the treaty to exercise enough supervision to *403 prevent fraud or mistake in enrollments and all other improper means employed to secure locations.
Again, it is said that the investigation was irregular because the superintendent making the investigation made his report largely upon the action of a Chickasaw council of Indians not attended by some of the commissioners. It was, however, as regular and formal as the original acts which placed the rolls before the Department for examination. The king of the Chickasaws was present — the same Ish-to-ho-pa who had lent himself to the attempts to get up. the lists — and two other commissioners were likewise present, with leading men of the tribe. The whole question then resolves itself on this branch of the case to the inquiry, “ Were these alleged reservees entitled to reservations ? ”
The Secretary said not. He could not have said otherwise when he had before him the statement of Chickasaw Agent Upshaw (who had succeeded Reynolds) that he could not certify, and the original statement of that agent’s predecessor — Reynolds himself — that he could not attach the usual certificates to the rolls. Agent Reynolds had made the locations for all others as one of the commissioners as well as agent in Mississippi, and knew the exact situation. He further stated that he was satisfied that many Chickasaws had emigrated with the earliest Choctaw emigrants. As this was in 1831, it proved that the ground alleged for reservations rested on Choctaw claimants or persons intermarried with Choctaw women, but all of whom were as much a part of the Choctaw tribe before either of the treaties with the Chickasaws as Choctaws of full blood. So, if there was one fact better established than another at the time, it was that the persons attempted to be enrolled, whether half-breeds or full bloods or whites or other Indians, were regarded by both tribes in the enjoyment of every Choctaw right. Both tribes spoke the same language, and an investigation was a necessity for the proper execution of the treaty. It resulted in admitting to reservations Indians who were Chickasaws and properly entitled, as it appears that some of the very land now claimed was located to them between 1840 and 1844. It likewise resulted in excluding the Indians from Avhom Ayres claims-
*404 The Secretary of War declared that if the committee provided in the fourth -article of the treaty of 1834 (which report he says was concurred in by the agent and superintendent) had reported in favor of any Chickasaw who emigrated prior to the treaty of 1834, such claim could not be allowed. If the Secretary had the authority to pass upon this question, as we think he had, then under the well-known rule of departmental construction this decision should not be set aside-without cogent reasons. Such contemporaneous construction, so long continued, should be considered as final unless it be clearly shown to have been erroneous. “ It is a settled doctrine” of the Supreme Court “that in cases of ambiguity the judicial department would lean in favor of a construction given to a statute by the Dejmrtment charged with its execution, and if such construction be acted upon for a number of years the court will look with disfavor upon any sudden change whereby parties who have contracted with the Government upon the faith of such construction may be prejudiced. It is especially objectionable that a construction of a statute favorable to the individual citizen should be changed in such maner as to become retroactive.” (United States v. Ala. R. R. Co., 142 U. S., 621.) Of course, if the departmental construction were obviously wrong, it would be the duty of the court to so adjudge; but if there simply be doubt as to the soundness of the construction the action of the Government in conformity with it should not be overruled. (United States v. Finnell, 185 U. S., 236.) Especially should this departmental action stand if it had the effect to settle titles to such a domain as is claimed when the Indians against whom it was made instituted no ejectments to obtain rights under the treaty. Their acquiescence enabled the Government to act. Nor is there proof to show that any one of Ayres’s grantors were Chickasaws by blood, merely absent, and entitled to land within the language and intent of the treaty now to be noted.
The treaty of 1832 ceded to the United States by the Chickasaws, who were then communal owners, all the land owned by them on the east side of the Mississippi River. Article IY provided that should the Chickasaws fail to procure such a country to remove to previous to the first pub- *405 lie sale of these lands, then they were to select a comfortable settlement for every “ family in the Chickasaw Nation,” to be held and occupied until they should find a country. The United States guaranteed quiet possession and uninterrupted use of the lands so long as the Chickasaws “ might live on and occupy the same.'1'1 The object was to rid the State of Mississippi of the Indians and to give them homes elsewhere. When such was found and they were removed, their occupancy of lands in Mississippi was to cease and .these lands were to be sold by the United States. (Supp. Oct. 22, 1832, 7 Stats., 388.)
By Article II of *the treaty of 1834 it was declared that “ the Chickasaws are about to abandon their homes.” Articles V and VI designated the persons entitled to reservations in fee. By Article XIV all the articles of the treaty of 1832 inconsistent with the last treaty were revoked except as to the twelfth and thirteenth. Thus, the title to the residue of the lands after the selections and locations had been made under the treaty of-1834 remained in the United States, to be held by the Government and the proceeds devoted to the purposes named in the treaties. (Holden v. Joy, 17 Wall., 211.)
Article VII of the treaty providing for reservations conferred certain rights upon intermarried white persoris. It provides that “ Bights to reservations as are herein and in other articles of this agreement secured will pertain to those who' heretofore intermarried with the Chickasaws and are residents of the nationUnder this resident white men married to Chickasaw women were as fully within the contract as Chickasaw residents of full blood. But such intermarried whites could claim nothing resident elsewhere, even though children of that marriage were Chickasaws. Indian custom was such that when the woman married it was her husband who came to dwell in her tribe and not she who passed over to his. So, if Chickasaw men had married into other tribes it was they who became identified with the tribe into which they married. It may have been that some of these persons who were insufficiently enrolled were Chickasaw men married to Choctaw women, which would make such Chickasaw men Choctaws by intermarriage, because the women were Choctaws by blood, and the children of such *406 marriage would be Choctaws of the same blood. If Chickasaw women had married Choctaw men and, contrary to Indian custom, had become incorporated into the tribe to which their husbands belonged, this treaty would have excluded such Chickasaw women and their Choctaw husbands from the right to reservations unless resident on the, soil as Ghicka-saws. Indians affiliated with other tribes were excluded.
These alleged reservees could not legally be both Choctaws and Chickasaws. Residence qualifications were necessary to be shown to entitle parties to enrollment. No matter how listed, claims could not extend'to the right of soil if there was antecedent abandonment of the soil and adoption elsewhere so as to entitle such Indians to rights in another tribe.
There is no expression in this treaty covering every living Chickasaw as, for instance, in the treaty between the United States and the Cherokee Nation (9 Stats., 871), where the lands ceded “ shall be and remain the common property of the whole Cherokee people.” In Red Bird v. United States (203 U. S., 76) Chief Justice Fuller emphasized this phase of the Cherokee agreement in dealing with the right of enrollment so as to entitle the persons enrolled to participate in the distribution of vested funds arising out of the distribution of lands. But the claims to reservations here do not present a controversy over a common fund where the right to participate can be asserted regardless of expatriation and where Indian laws and customs prevail, except as they conflict with the laws of the United States. The treaty we are considering indicates intention to confer property rights on certain unremoved classes of Chickasaw Indians with the addition of the same property rights on all intermarried persons to Chickasaw women resident. in the nation as upon Chickasaws themselves.
Recurring to the treaty of 1832, the Chickasaws had no rights as individuals beyond temporary right of occupancy. They were neither tenants in common nor joint tenants, and in that particular were like other owners of communal property, wherein every member of a tribe, not as an individual, but as a member of the community, held an equal, undistinguishable, indivisible right of user and nothing more. Nott, Ch. J., in Cherokee Nation v. United States (40 C. Cls. R., *407 325), emphasizes the status of such persons by repeating from the previous decision of this court in Western Cherokees v. United States (27 C. Cls. R, 53) : “ The individual had no vested right yrhich he could convey or devise or make the subject of a suit in partition. If he withdrew from the community, he left all rights behind him; and if a stranger was admitted, he acquired a right by virtue of his admission alone.” In Journey cake, 155 U. S., 196 (affirming this court), Mr. Justice Brewer held that all adopted citizens of the Cherokee Nation must be regarded in the administration of their constitutional rights, civil, political, and personal, as Cherokees. We think that rule obtains here, because this treaty is one of contract for land, the purpose of which was to admit to reservations all Choctaws intermarried with Chickasaw women and, according to Indian custom, residing on the communal property of the Chickasaws, and all white men also intermarried with Chickasaw women and resident on the soil — the treaty recognizing Indian- custom, which included intermarried whites, if residents, but excluding persons alien to the soil and admitted to citizenship into another tribe before the treaty took effect. It must affirmatively appear that listed names were parties to the treaty and entitled to share in its benefits and not in those benefits conferred by adoption into another tribe.
Considering that under the treaty of 1830 the United States removed these persons from whom Ayres claims as Choctaws, that the terms of that treaty confided to discreet agents the removal of Choctaws only at the expense of the Government (without authority to remove any of the Chickasaws) , and that there is no evidence to overthrow the presumptions ' created by this action of the Governmeht-— strengthened as that action was by the conduct of the Choctaws. in taking with them Indians only who were identified as members of their tribe entitled to land in the country whence they were removed — the court can not find that the persons covered by the incomplete lists transmitted to the Department May 4,1839, by the Chickasaw agent were other than Choctaws. If this court should now attempt to state from this record that the alleged reservees were Chickasaws, such finding would necessarily rest on inferences of the most *408 inconclusive character; be unsupported by proof; contrary to any action taken by tjie majority of the commissioners designated by the treaty to make the locations; opposed to the belief of the Chickasaw agents and contrary to the findings of an equally disinterested superintendent specially employed to investigate the status of these persons; and, finally, in direct opposition to the findings of the Secretary of War.
We are strengthened in these conclusions by the most direct and preponderating evidence that the persons from whom Ayres claims were Choctaws under the Dancing Rabbit Creak treaty of 1830 between the Choctaw Nation and the United States and that these alleged reservees were not parties to either treaty between the United States and the Chickasaw Nation and consequently not within the terms of the grant provided by the treaty of 1834 for the Chickasaws.
With this we might stop. But the record discloses an insuperable obstacle to relief under the terms of this act. If we could assume that the persons from whom Ayres claims were entitled to reservations despite the failure of the commissioners, chiefs, and agents to locate them and despite the measures taken by the parties to arrive at the truth when they were all living, Ayres yet acquired nothing which courts, either of law or equity, could recognize as rights.
Article IV of the treaty stated that many of the Chickasaws were competent to manage their affairs, but some were not capable and might be imposed upon by designing persons. It was therefore provided that the lands of reservees should “not be permitted to be sold, or disposed of, unless” (1) the reservee was first declared, by the certificate of two out of seven persons therein named, to be capable of managing and taking care of his or her own affairs; (2) unless the consideration was first paid and fair; (3) unless the competency of the reservee and the reasonableness and fairness of the consideration and the fact that it had been paid was first certified by the Indian agent; (4) unless the President of the United States or some other person designated by him first approved the deed and such approval indorsed thereon; (5) unless such deed and approval was first registered at the place within the time required by the laws of the State *409 in which the lands were situated. Without all these conditions the deeds were to be held void.”
None of the five conditions necessary to confer title were complied with in the present case, and some of these preliminaries are quite important. The' second,'as to the necessity of a certificate to show that the consideration obtained was a fair one and fully paid, was material for the protection of the Indian. It is especially so in the matter before us to determine the measure of protection which the Indians received in their alleged dealings with Ayres and Niles. Supplement to the treaty of 1832 fixed the minimum of all the reserved tracts of land at $3 an acre until the nation might determine to reduce the price, of which the President was to be notified. This notice was never given, and as the clause originating two years before the cession of 1834 was not repealed by the last treaty, and as the lands alleged to have been purchased by Ayres were “ reserved tracts ” under both treaties, the consideration alleged to have been given does not seem to have been a fair one because it is claimed nowhere that Ayres and Niles gave for any part of the land more than $1.25 per acre. If the land was fixed by the treaty at $3 minimum, it would seem that the same land enhanced in value instead of depreciating with the rapid settlement of the country'about that time.
The fourth requirement of the treaty was indispensable.
Nor does the evidence establish to the satisfaction of the court the amount of the payments. Ayres appears to have rested upon the instruments of writing which recite a consideration of $1.25 per acre. Had he dealt with people presumably intelligent, and not with untutored Indians signing by a mark, the want of evidence to rebut the presumptions arising from receipts would reasonably establish recitals. But the instruments of, writing, except two, were withheld pending the entire investigation; no claim of payment was made or proof offered in order to get the President to approve the instruments and make them valid as deeds; not only Ayres but his subscribing witnesses were silent in the courts, before the Departments, and at the land sales in Pontotoc as to payments of anything. Reynolds had been Chickasaw *410 agent and was yet one of their commissioners in Mississippi, who was near enough ho Áyres to certify to payments had there been any. The certificates of two commissioners (besides the agent) were declared necessary by the treaty. They were essential if Ayres expected the President to approve. The certificate on information taken as to 21 of the instruments of writing in 1840 never saw the light when it was vital to Ayres to produce it. The superintendent of Indians in the vicinity, investigating more than a year, officially reported adversely about the matter of payments. No sworn testimony appears to have been presented to a single commissioner as to the payment of anything, and nothing was offered to anyone in authority at a time when an investigation could have satisfied some President that injustice was being done by withholding approvals. The court has gone far enough in finding that some payments were made, but rests that finding on the belief that something in hand, though nominal, was necessary to procure signatures of the Indians. That Ayres himself never attached any importance to these transactions is attested by withholding these instruments of writing thirteen years from public record (wholly unacknowledged in the meantime) and finally by the knowledge that he must have had that he was dealing with people unlisted and unenrolled under the terms of the treaty. This court’can not assume that he did not know the law.
Considering the character of the jurisdictional act, the amount paid is not material, because the amount required to be reported for reimbursement, if any, depends on whether Ayres acquired a title.
Ayres was not an innocent purchaser for want of Indian location, as well as want of actual possession as against those holding the patents. The instruments of writing under which he claimed were not recorded in the proper office where, by the statutes of Mississippi, deeds were required to be recorded to be effective as constructive notice. (Code of 1848; Dixon v. Doe, 1 S. and M., 70; Hall v. Thompson, ib., 443; Witty v. Hightower, 6 ib., 345; Humphries v. Partie, 10 ib., 242.) True,, the papers were recorded in 1852, but they were void as deeds even then, and this kind of a notice was of no greater effect than the deeds themselves. Though the instruments of writing on which *411 the present claim is made did not afford this constructive notice by being recorded for lack of approval by the President, the failure to record for eight years after the Government had sold the land is significant of the value put at the time by Ayres upon the papers as conveyances. Nothing is disclosed to explain why the instruments of writing relied on remained unknown to the world until after the Government had investigated and declared that there were no enrollments. The record does not show that any claim of title was asserted at the public land sales, or that when persons were going into possession adverse' claims were asserted or would be made.
In Niles v. Anderson (5 How. Miss.), where the claim for equitable title is now wholly rested, it was held that a person in possession under an unquestioned Indian title might enjoin the possessory action of another who claimed under a conveyance from the same rightfully located reservee, who had obtained the certificate of the Chickasaw agent in the usual form as to capacity, but not as to consideraton; and had also obtained the approval of the examining agent in fraud as against the person first in possession. The decision sustained the fraud charged against Niles — that Anderson on June 1, 1838, 'purchased from the rightful reservee and took a conveyance with the certificate of two Chickasaw chiefs as to the competency of the grantor, but no certificate of the Indian agent, and under that went into possession. Niles claimed under another deed from the same Indian, dated March 31, 1836, and instituted action against Anderson in, forcible entry and detainer for possession. Anderson then filed in chancery a proceeding to enjoin, alleging that the conveyance to Niles was executed before location of the reservation and that it was taken in blank and afterwards filled up with knowledge on the part of Niles of the Anderson claim; that this conveyance to Niles had appended to it the certificate of the Indian agent, dated February 10, 1838, and approved by the examining agent. The charge was that this certificate was secured by misrepresentation in substituting one Indian for another; that the Anderson conveyance had been presented to the agent and had not been approved because of the previous approval of the conveyance to Niles. The prayer of the *412 bill was that the parties who had prevented Anderson from proceeding to obtain the necessary approval to his conveyance be held to be trustees. Thereupon Niles demurred, and the court said:
“ The demurrer admits that the deed was filled up long-after it was executed and that the certificates were procured by fraud and misrepresentation (of Niles) ; that one Indian was substituted for another; and certainly, .with such facts admitted, a court of chancery could not hesitate to entertain jurisdiction and give relief.”
The court gave relief by giving the parties in possession under the Indian an opportunity to go to the President for approval of the Indian conveyance. The case was decided entirely upon the admission that Niles had a title, but one obtained by fraud. It was not to the interest of either party to deny the reserved’s right to convey, and, in fact, the object for which the bill was filed was to give the person purchasing-in good faith from the Indian with a lawfully located reserve an opportunity to obtain the things necessary under the treaty to make the title perfect. The court assumed that this title could be perfected by the proper certificates, which the parties claiming relief were prevented from procuring by the fraudulent acts of Niles. On this point the Indian “ conveyance would have been perfect with the proper certificate, which the parties were prevented from procuring by the fraudulent acts of the respondents. The first step toward a perfect conveyance was performed. The subsequent steps were prevented by the respondents to the prejudice of the complainants. The title is not a complete title, but it can be perfected by a court of chancery, at least so far as to remove the impediments improperly imposed.’’'’
The impediments which the court removed were the fraudulent means employed by the party out of possession against the one in possession, the decision resting not only on that but on the distinct statement that possession alone was a protection against a title obtained in fraud. “ Out of respect for the arguments of counsel ” the court went beyond matters necessary to the decision by saying that the certificates of capacity which the subordinate agents were to give were not conditions precedent to the Indian deed, “ as the President *413 still has tlie power to approve or disapprove.” Concerning restrictions upon the fee, “ it lias always been conceded that conveyances by Indians could only be made according to the conditions imposed by the treaty.”
Niles v. Anderson was confirmed in a subsequent case by that court where the' certificate of capacity did not appear to a conveyance. The court held that there was no necessity for one of the seven to get any of the others to certify to his own capacity as a grantor, because the spirit of the treaty did not embrace those who by its terms were appointed to judge of the capacity of others to convey. But the certificates constituted prerequisites to a good title. (Pointer v. Trotter, 10 Smed. & Mar., 540.) .
Again, in a later case, it was declared that—
“ The power to alienate is but an antecedent to the ownership of the soil, and the supreme power may always prescribe the forms and ceremonies to be observed in alienating. As well might it be contended that any citizen of the State can dispose of his realty regardless of all statute provisions.” (Harmon v. Partier, 12 S. and M., 427.)
The Supreme Court of the United States has steadily given effect to treaty restrictions where Indians are concerned, not merely because of treaty supremacy over any claim of equitable right, but pursuant to public policy involved in protecting the ignorant and the weak against the cunning and the strong. That court has never interfered with the President’s right of approval, because in giving effect to the grants embodied in treaties the obligation is made imperative to recognize those provisions carrying protection to beneficiaries. (Pickering v. Lomax, 145 U. S., 310; Lomax v. Pickering, 173 ibid., 26; Lykins v. McGrath, 184 U. S., 173.)
What, then, is an equitable title? We need go no further for a definition than that summarized from the equity jurisprudence of both the English and American systems by that great judge who delivered the opinion in Anderson v. Niles, supra. “An equitable title,” said Chief Justice Sharkey, “ is a right imperfect at law, but which may be perfected by the aid of a court of chancery, either by compelling parties to do that which in good faith thejr are bound to do, or by removing obstacles interposed in bad faith to the prejudice of another.”
*414 By this rule equity could have done nothing for Ayres. If his grantors were not the possessors of the legal right- (as we have shown they were not), Ayres acquired nothing. If they were, but could neither sell nor convey, his right could not have been perfected in chancery. If we could assume that the certificates to locations in their names conferred on them the undisputed legal right, then the,claim that such grantors were trustees for Ayres’ equitable ownership could not stand, as in every claim for an equitable title the holder of the outstanding legal title must be the possessor of such a nominal right for the use and enjoyment of the real owner as equity could enforce. But, as under the treaty the grantors could neither sell or convey, Ayres could enforce nothing against them. No kind of an enforcible interest passed to him by instruments of writing not merely voidable, but void. These instruments are before this court as much void now as when Ayres took the risk of having them approved by provisions of that treaty which gave the President the power to protect against their improvident execution. Whatever title that was acquired by proper reservees under the treaty was an indefeasible fee subject to conditions which courts could neither abrogate nor control. Reasons may be inferred from what has appeared for such approval having been withheld. But whatever the reason, there was never a time when the courts could supersede or modify this treaty designed as much for the protection of individuals as for the collective body of Chickasaws. The United States were as much bound to execute the general trusts for the benefit of the nation as to see that individuals got their locations. The obligations assumed could only be executed for both by enough supervision at the time to see that its terms were strictly observed.
Assuming that Ayres had bargained with these alleged re-servees — that as between them it was determined that actions of ejectment should not be instituted in their names to test the validity of the patents as in the other decided cases and that Ayres alone could have availed himself of the title conferred by his purchases, chancery was apparently open to him if he had any rights. Under an act approved February 5, 1841 (Miss Code 1848, U3), it was provided that in all *415 cases in which persons not the rightful owners of real estate situated within the State of Mississippi should have a deed which might form a cloud on the title or claim of the real owners of such real estate real owners might file a bill to have such outstanding deed cancelled and such cloud removed from their own title and the real owners confirmed in their equity whether such real owners were in possession of the real estate or not; and that persons having the equitable title to any lands in the State might file a bill in chancery to divest the legal title out of such persons as the same might be vested in. Whether this statute enlarging the jurisdiction for purposes of quia timet bills-could have been applied as the patents were not the common source of title is unnecessary to inquire.
It is certain complainant must have shown fairness of his own title (Boyd v. Thornton, 13 Smed. & M., 338); and he must have had a perfect legal or a perfect equitable title to show the invalidity of his adversary’s claim. (Toulmin v. Heidelberg, 32 Miss., 268.)
But Ayres had no equitable title. Courts of equity could create none out of his intangible claim. When he undertook to bargain with his grantors in advance of the action of the chiefs, commissioners, and agents who were invested with the power to determine who were within the terms of the grant he took upon himself the right to determine for himself the future exercise of the register in issuing certificates and can not now avail himself of its improper exercise; and he likewise took the risk of showing enough good faith in the matter of his alleged purchases to obtain the approval of the President. The proofs do not establish that the refusal of the different Presidents who considered the matter of approval was arbitrary. Rather do these proofs establish that there was neither constructive fraud nor error in the withholding of the action of the Executive from time to time when the matter was open for far better consideration than now. But no matter whether the reasons for refusing to sanction the dealings of Ayres were good or insufficient, the treaty invested the President with authority to act or *416 not act in the matter of approval, and the courts are without authority to review his discretion. In the absence of fraud, imposition, or mistake .(154 U. S., 327), persons holding under the patents were safe against collateral attack when they went into possession, and the lapse of time discloses nothing from which this court can hold that the Government wrongfully appropriated the land described in the petition.
The judgment as at law will be that the representatives of Eli Ayres be paid nothing from the defendants; and the decree of the court, considering the cause as a proceeding in equity, must likewise be that they be paid nothing from either the United States or from the funds of the Chickasaw Nation by the Government.
The findings of the court will be transmitted to Congress together with a copy of this opinion.

 Reported eases on questions of title under this treaty show the names of lawyers such as Jacob Thompson (later Secretary of the Interior), Judge Hugh Miller, T. J. Word, John B. Sale, W. P. and John IT. Jack, Goodwin & Sale, George S. Yerger, Judge A. M. Olayton, W. X. Gholson, J. F. Cushman, R. W. Edmonson, Charles D. Fontaine, William F. Stearns, and Judge J. W. C. Watson. Among these the writer recognizes the names of counsel who were considered leaders at a bar inferior to none in its day and generation.