## NATIONAL BANK OF COMMERCE IN ST. LOUIS v. HENRY CLAY PIERCE, Appellant.

**Division Two, March 22, 1920.**

1. **APPELLATE PRACTICE: Action at Law.** In a review of an action at law tried without a jury in the circuit court, wherein the judgment is assailed on the ground that it was contrary to the facts developed at the trial, the chief concern of the appellate court is to ascertain whether there is any substantial evidence to support the judgment.

2. **EVIDENCE: Admission Without Objection.** In an action at law appellant cannot on appeal complain of the admission of a memorandum in evidence which was admitted without objection.

3. **PLEDGE: Surrender of Collateral: Substantial Evidence.** Where the trial court, sitting as a jury in a law case, has found that the ten thousand shares of stock, which is the subject of the controversy, were pledged to the plaintiff bank as collateral security for a loan and that the bank had never surrendered its lien thereon, and there is substantial evidence in the record to support the finding, the appellate court is not at liberty to rule that the evidence to support the finding was not sufficient. In such case it is of small concern with the appellate court whether, if it were trying the case *de novo*, it would have made the same or a different finding.

4. **LIMITATIONS: Conversion: Finding of Fact.** Where there is substantial evidence that the stock, pledged to plaintiff to secure a loan, was delivered to defendant within five years before the suit was brought and that he did not convert it to his own use until after its delivery to him, it cannot be ruled on appeal that the action for damages for the wrongful conversion of the stock was barred by limitations.

5. **CONVERSION: Nominal Damages.** Testimony by defendant in a deposition on a former occasion, introduced in evidence by plaintiff and uncontradicted by him, that the properties of a railroad company, whose entire capital stock was pledged to plaintiff to secure a loan of $700,000, was worth one million dollars, is sufficient to support a judgment for seven hundred thousand

dollars in a suit for damages for the wrongful conversion of said stock to his own use.

6. **AMENDED ANSWER: Discretion of Court: After Judgment.** The question of permitting amended pleadings to be filed is one resting largely within the discretion of the trial court; and where defendant did not ask permission to file his second amended answer until about three months after the court, sitting without a jury, had rendered judgment for plaintiff, and the answer, as offered, set up new matters of defense not pleaded in the answer upon which the case was tried, the court did not abuse its discretion in refusing to permit the answer to be filed, although at the time permission was asked a motion for a new trial was still pending.

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey,* Judge.

AFFIRMED.

*Boyle & Priest, Judson, Green & Henry* and *Fordyce, Holliday & White* for appellant.

(1) There was no evidence of a pledge. (a) When a note is paid, the object of any pledge therefor has been performed, and the pledge contract and lien ceases to be operative, and the whole beneficial interest therein becomes vested in the hands of the pledgor. Southward v. Lamb, 82 Mo. 242; Story on Bailments, secs. 365, 364, 361, 359; Wilkinson v. Misner, 158 Mo. App. 551. (b) To establish a pledge for the $700,000 notes, it devolves upon plaintiff to show that the owner, the Tennessee Construction Company, consented to the stock being held after the $500,000 note was paid; and such consent cannot be inferred from silence, unless it were shown there was knowledge and acquiescence. (c) The burden of proof is upon the plaintiff in this case to show by preponderance of the evidence that there was a valid contract of pledge duly executed, and with possession thereunder, to secure the notes in question. Cantwell v. Johnson, 236 Mo. 605; Jones v. Hubbard, 193 Mo. 147. (d) Independent of a new agreement to that effect, the pledgee cannot withhold the pledge as

collateral for a debt other than that to which the pledge was originally made. Southward v. Lamb, 82 Mo. 242; Wilkinson v. Misner, 158 Mo. App. 551; Taylor v. Jones, 3 N. D. 235. (e) A void pledge creates no lien and gives no right of possession. Smith v. Becker, 192 Mo. App. 597. (f) "Where two constructions are equally available, that one ought not to be adopted which is most favorable to the pledgee." Dibert v. D'Arcy, 248 Mo. 644. (2) The delivery of the certificates by the bank was a surrender of any rights of pledge, if the pledge existed. (a) The admitted delivery in this case of the certificates for the Terminal stock by the bank to the alleged pledgor, the Construction Company, for it to dispose of for its own benefit, without any promise whatever of a return of the certificates, in the event of a failure to make the sale, was, in law, a surrender of any right of pledge, if any existed. Kellogg v. Thompson, 142 Mass. 76; Jones on Pledges, secs. 40, 86, 87; Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779; Harding v. Eldridge, 186 Mass. 39; 22 Am. & Eng. Enc. (2 Ed.) 860; 31 Cyc. 817; Thompson v. Dolliver, 132 Mass. 103. (b) The delivery by the bank to the Construction Company of the stock was in no sense a delivery for a temporary purpose within the meaning of the law. The bank officials admit that they considered the sale an absolute one and they did not expect a return of the stock. If the bank desired to protect itself in the contingency of a failure of the purchase at the end of three years' option, it could have done so by taking a receipt for the stock, as it did in the case of the bonds delivered at the same time and deposited with the Trust Company. (c) The option contract expressly provided that the Terminal stock should be redelivered to the Construction Company (pledgor) and not to the bank (pledgee); this is in sharp contrast with the provisions of the option contract which stipulate for the return of the bonds directly to the depositors of the bonds, who were given receipts by the Colonial Trust Company. Kellogg v. Thompson, 142 Mass. 76. (d) The defense of surrender is available

to defendant without proof of facts showing an estoppel, or that Pierce was misled to his prejudice and without proof of any consideration for the surrender. The mere voluntary loss of possession extinguishes the pledge, for possession is an essential requirement of a valid pledge. Kellogg v. Thompson, 142 Mass. 76; Thompson v. Dolliver, 132 Mass. 103; Walker v. Staples, 5 Allen, 34; Holmes v. Crane, 2 Pick. 607; 22 Am. & Eng. Enc. (2 Ed.) 860; 31 Cyc. 817; Jones on Collateral Securities, sec. 40; Story on Bailments, sec. 364; Dobie on Bailments and Carriers, p. 239. (e) However, the bank is estopped by its conduct, contracts and long-continued acquiescence in the surrender, to deny which would be to the great prejudice of Pierce; and the mutual stipulations in the option contract on which the bank acted, and the stipulations in Pierce guaranty as to the collateral, are sufficient considerations, if any were needed. (3) Plaintiff's alleged cause of action, if any, dates more than five years prior to the filing of this suit, and the alleged cause of action is therefore barred by the Statute of Limitations. The stock was surrendered to the Construction Company in July, 1905, and then passed out of the possession of the plaintiff, actual or constructive, without any receipt therefor evidencing any right or continued control, and said stock continued under the dominion and control of the Construction Company while it was in the hands of the Trust Company. There was no change in this dominion and control during the three years from 1905 to 1908, and there was, of course, no such change of dominion and control from 1908 to 1913. The suit was filed April 12, 1913. R. S. 1909, sec. 1889. (a) The court below sought to escape this bar by dating the alleged conversion in December, 1908, but there is no warrant whatever for this distinction. The stock was in the possession of the Construction Company and under its control from the time of its delivery to Senator Bailey as its attorney and agent in July, 1905. It was deposited for the benefit of the Construction Company with the Standard Trust Company under the ex-

press undertaking to redeliver the same to the Construction Company when the purpose of the deposit was performed. (b) It is a general and fundamental rule that the Statute of Limitations may be invoked by a successor in right or title. As Pierce claims title under the alleged pledgor, the Tennessee Construction Company, the question is whether the latter first acquired posession; and it is admitted by plaintiff that this was on July 27, 1905, for on that date Senator Bailey, its attorney and representative, acquired possession of the stock and delivered it to the Trust Company in New York on behalf of the Tennessee Construction Company, and thereafter delivered the receipt therefor to the Construction Company. The test is, not when Pierce acquired possession, but when the plaintiff lost possession to defendant's predecessor in title. 25 Cyc. 1009; Wood on Limitations, sec. 41. (c) While the bar of the statute is complete on the undisputed testimony, dating from the surrender of the stock to Bailey in July, 1905, it must not be overlooked that the actual loss of lien on the stock by the bank dates back to June 24, 1904, when the $500,000 note, for which it was specifically pledged, was paid. Assuming that this stock remained in the possession of Van Blarcom, who occupied a dual position of officer of the bank and also of the Construction Company, in this anomalous condition the burden is clearly on the bank to show by satisfactory proof the specific pledge of the stock for the $700,000 debt. (4) Even if plaintiff's action can be considered one in trover, all that defendant would be liable for, if at all, would be nominal damages and under some circumstances a return of the Terminal stock. Since the Terminal stock has remained *in statu quo*, and since it came into the hands of Mr. Pierce, without knowledge of the interest of the plaintiff, or without willful wrong, it must be accepted by plaintiff in complete acquittal of damages, assuming that plaintiff is liable. Ward v. Moffett, 38 Mo. App. 395; Hart v. Skinner, 16 Vt. 138, 42 Am. Dec. 500; Atkins v. Gamble, 42 Cal. 86, 10 Am. Rep. 282. (5) If there should

be a recovery, it should be for nominal damages, for there was an entire failure to show that this stock had any substantial value. Deck v. Feld, 38 Mo. App. 680; 4 Sutherland on Damages (4 Ed.), sec. 1113, p. 4223. It is a fundamental principle in the measure of damages in trover that long-continued acquiescence by pledgee in the pledgor's possession with a knowledge of the latter's claim of right will, in an action of trover, bar plaintiff's right to damages that would not have been suffered but for such acquiescence. 38 Cyc. 2104; Rogers v. Brittain, 39 Mich. 477. In this case, this acquiescence continued not only from 1905 to 1908, but from 1905 to 1910. (6) The memorandum claimed to have been made by Matthews was not admissible in evidence. (a) The alleged pledge is a special contract, and entries in books or records are not admissible to prove such contracts. Smith v. Blakely, L. R. 2 Q. B. 325; Lackey v. Schreiber, 17 Mo. 146; Hall v. Woolen Co., 187 Pa. 18, 52 L. R. A. 711, note 6; Jeffries v. Castleman, 68 Ala. 432; Griesheimer v. Tanebaum, 26 N. E. 957; Anchor Company v. Walsh, 108 Mo. 277; 3 Jones's Commentaries on Evidence, sec. 574. (b) Matthews had no authority from the bank either to demand additional security from the Construction Company or to enter into any agreement with the Construction Company for further security. (c) It is not the best evidence. No record of the action of the Board of Directors of the bank in regard to the pledging of the stock was in evidence, and no record of the Construction Company, authorizing the pledge, was shown. (d) The making of the memorandum was not a part of the *res gestae* between the parties to the action. Greisheimer v. Tanebaum, 26 N. E. 957. (e) The memorandum is purely self-serving. A party to a contract, the terms of which are in dispute, cannot give in evidence his own statements, either oral or written, made subsequent to the alleged contract, in corroboration of his version of the contract, nor can such statements be used in evidence to prove the existence of a contract. The memorandum was made subsequent to the transac-

tion and after the controversy arose. Rudd v. Robinson, 126 N. Y. 113; Greisheimer v. Tanebaum, 26 N. E. 957; Wharton on Evidence (3 Ed.), sec. 662; Angell & Ames on Corporations (11 Ed.), sec. 679; 2 Jones on Evidence, sec. 270a (272). (f) The memorandum is not signed by the Construction Company, nor by Mr. Pierce, who are the parties sought to be charged by the memorandum. The memorandum was not even known to them until after suit was filed and the testimony being taken.

*Geo. L. Edwards* for respondent.

(1) The deposit of the Nashville Terminal Stock with the Bank on the 18th of July, 1904, as additional collateral to secure the notes of the Tennessee Construction Company, aggregating $700,000, constituted a pledge of this stock to the Bank for that purpose. The proposition is elementary. Trust Co. v. McMillan, 188 Mo. 569; Wilkinson v. Misner, 158 Mo. App. 561; Jones on Collateral Securities and Pledges (3 Ed.), secs. 4 and 5. (2) It is well settled that "where the pledgor secures the possession from the pledgee for a special purpose only, the pledgee does not part with the legal possession, and his rights in the property are not lost. There may be a re-delivery by the pledgee to the pledgor for a temporary purpose, without surrendering the pledge." The certificates of stock involved were sent to Bailey to be delivered to the Standard Trust Company for the sole purpose of having them deposited to meet the conditions of the option contract. If the option contract should not be exercised, the stock was to be returned to its proper holder. This obviously did not amount to a surrender of the pledge. Harding v. Eldridge, 186 Mass. 39; Jones on Collateral Securities and Pledges (3 Ed.), sec. 40. (3) In the absence of a contrary showing, and there was no contrary showing in this case, the Nashville Terminal stock as a matter of law, is presumed to be worth its face value. Trust and Savings Co. v. Home Lumber Co., 118 Mo.

461; Moffitt v. Hereford, 132 Mo. 521. (4) Where a jury is waived and the issues of fact submitted to the judge, his findings are as binding upon the appellate court as is the verdict of a jury. Butler County v. Boatmen's Bank, 143 Mo. 13; Trust Co. v. McMillan, 188 Mo. 567.

WILLIAMS, P. J.—This is an action at law tried without a jury in the Circuit Court of the City of St. Louis, by which action the plaintiff sought and recovered a judgment in the sum of $700,000 as damages, for the alleged conversion, by defendant, of ten thousand shares of the capital stock of the Nashville Terminal Company. From the above judgment defendant has duly perfected an appeal.

Plaintiff's theory of the case is that this stock was deposited with it on July 18, 1904, as collateral, upon certain notes of the Tennessee Construction Company, totaling $700,000; that the bank never surrendered its lien on said stock, but that the defendant in December, 1908, obtained possession of said stock and thereafter converted the same to his own use and to plaintiff's damage in the aforesaid sum.

Defendant's theory of the case is: (1) that the stock was never pledged to the plaintiff bank as security for this loan; (2) if said stock was ever so pledged the bank thereafter surrendered or waived its right as pledgee of said stock; (3) even though it be found that defendant did convert the stock, the plaintiff suffered only nominal damages; and (4) if plaintiff ever had any cause of action, the same has become barred under the five-year Statute of Limitations.

Several days were occupied in the trial of this case and we have before us a very large printed record. Counsel in their briefs do not seem to have been able to agree entirely upon the facts. We have therefore made a careful review of the entire record for ourselves.

This is an action at law and one of our chief concerns upon this review is to ascertain whether there

is any substantial evidence to support the judgment of the trial court. It will therefore be unnecessary to set out in tiresome detail all of the testimony, as though we were reviewing the case as a court in equity, but it will be sufficient to confine our statement of facts very largely to that portion of the evidence which will throw light upon the question of whether there was substantial evidence to support the judgment below.

The evidence tending to support plaintiff's theory of the case may be summarized as follows:

The Tennessee Construction Company, a Missouri corporation, with a capital stock of only $2,000, was used, by one J. C. Van Blarcom and associates, as a corporate organization, through which said Van Blarcom and associates constructed several million dollars worth of railroad property in the State of Tennessee. Said Construction Company made contracts with railroad companies to do certain railroad construction work, and in payment for such work generally took all the capital stock of the railroad company and the mortgage bonds which were issued upon the properties thus constructed. Van Blarcom was vice-president of said Construction Company and up to May, 1911, was largely in control of said company, and was apparently its sole financial agent, negotiating loans for the same by using the stock and bonds as collateral.

One of the railroad properties which the Construction Company built was the Nashville Terminal Company. This consisted of about fifteen miles of terminal railroad in the southern portion of the City of Nashville, Tennessee, and certain switch tracks to local industries. This was constructed as a terminal property to be used in connection with a railroad afterwards known as the Tennessee Central Railroad Company, part of which was being built by Van Blarcom and associates through the Construction Company.

As part payment for its work in constructing the Nashville Terminal, the Construction Company acquired all of the capital stock of the Nashville Terminal Company, amounting to ten thousand shares, of the

total par value of one million dollars. This is the stock which forms the basis of this law suit.

This same Van Blarcom was a large stockholder in and a director of the plaintiff bank. Up until December, 1905, he was vice-president, and thereafter and until his death on October 24, 1908, he was the president of said bank. During all of this time defendant Pierce was one of the large stockholders of the bank and one of its directors. Pierce was also financially interested with Van Blarcom and others in the various railroad enterprises above mentioned.

In 1906, Henry C. Pierce and J. C. Van Blarcom, as plaintiffs, instituted a suit in the Circuit Court of the City of St. Louis, against the executor of the estate of William H. Thompson, deceased, for an accounting. This petition, among other allegations, contained the following:

"And plaintiffs state further, that on or about the 1st day of February, 1902, the said William H. Thompson and the plaintiffs herein entered into an oral agreement, whereby they mutually undertook and agreed to promote and finance the Tennessee Central Railway, a corporation organized under the laws of the State of Tennessee, which was then and there constructing and operating line or lines of railway located in said State, and to promote and finance other incorporated companies allied with the said Tennessee Central Railway, to-wit: the Nashville & Clarksville Railway Company, the Tennessee Central Railway Company, the Nashville & Knoxville Railway Company, the Brier Hill Collieries—all incorporated under the laws of the State of Tennessee; the Cumberland River Coal Company, incorporated under the laws of the State of Maine, and the Tennessee Construction Company, incorporated under the laws of the State of Missouri; and to acquire and hold jointly, either directly in their own names, or through the said Tennessee Construction Company, stocks and bonds of the said several corporations, and it was then and there agreed by and between the said parties that they would respectively, in equal shares,

provide and advance all necessary cash, credit, discounts and securities for the purpose of promoting, financing and carrying on the said Tennessee Central Railway and completing the construction of the railroad then and there being constructed and operated by the Tennessee Central Railway, as well as of the said Nashville Terminal Company, for the purpose of ultimately disposing of their joint holdings and interest in the said several corporations so as to realize a profit out of the same—which profits, as well as any losses that might be incurred, were to be shared equally by them.''

During the year 1902 the Construction Company, through its vice-president, Van Blarcom, negotiated with the plaintiff bank, three promissory notes, in the aggregate sum of $700,000. This loan will hereinafter be referred to as the $700,000 loan. This loan has never been paid and it is the loan which plaintiff bank claims this stock was pledged to secure. At the time this loan was negotiated it was secured by 750 general mortgage bonds of the Tennessee Central Railroad Company of the par value of $750,000 and 250 bonds of the Nashville Terminal Company of the total par value of $250,000. (It is not even claimed by the bank that the stock in question was placed with the bank as collateral when the loan was first made, but that the stock was deposited as collateral to secure this loan on July 18, 1904).

In October, 1903, the Terminal Company placed these ten thousand shares of stock with the plaintiff bank as collateral security for a loan of $500,000. This loan was paid off on January 24, 1904. What became of this stock immediately after the loan was paid the evidence is silent.

Plaintiff offered in evidence a memorandum (referred to hereafter as the Matthews memorandum) which was shown to have been in the handwriting of one Matthews, now deceased, and who in July, 1904, was the man in charge of the discount department of the plaintiff bank. The evidence tends to show that it was the duty of Matthews to keep track of the col-

laterals of the bank; that at that time the bank kept
no collateral register; that most of the bank's loans
upon collateral were evidenced by a collateral-form of
note which would give a description of the collateral
offered with the note, but when the bank loaned money
on collateral on a plain note (as was the kind of note
used in the $700,000 loan), it was the custom of the
clerks in charge of that department to make a smal'
memorandum concerning the collateral connected there-
with and to pin said memorandum to the note. It ap-
pears that it was the custom to keep the collateral itself
in envelopes and in a place apart from the notes.

The memorandum (mentioned above) in Matthew
handwriting is set forth in the respondent's supple-
mental abstract of the record as follows:

> $750,000 bonds Tenn .Cent. R. R.
> 250,000 bonds Nashville Term. R. R.
> 10,000 shares Nashville Term, R. R.
>                    x Dep. 7/18 '04
>
> (In pencil)
> A/c loans 700.

One of plaintiff's witnesses was permitted, with-
out objection to interpret the above memorandum as
follows:

"Q. Now, I will ask you to interpret to the court
what that memorandum means in connection with those
notes.   A. It means to convey the information that
there was $750,000 bonds of the Tennessee Central Rail-
way Company, $250,000 of the bonds of the Nashville
Terminal Company was deposited with these notes and
afterwards 10,000 shares of the Nashville Terminal As-
sociation was added to it.

"Q. When?   A. July 18, 1904.

"Q. As collateral security for those three notes?
A. Yes, sir."

One witness, who was once assistant cashier of
plaintiff bank, testified that many times as he looked
over the bank's papers he saw this Matthews mem-
orandum attached to the notes representing this

$700,000 loan, and that in October, 1904, he saw the 10,000 shares of stock down in the bank's vault among the collateral, which the bank held, securing these notes.

Some time prior to May, 1905, the defendant Pierce, who was closely associated financially with Van Blarcom and others in financing these railroad enterprises through the Tennessee Construction Company, seems to have become dissatisfied with the manner of Van Blarcom's management and apparently was unable to get from Van Blarcom an accurate detailed statement of the financial status of the properties and of the exact financial relationship which each person interested bore to the other. It seems to have been the desire of all parties interested to bring about a sale of all the railroad properties which were under the control of the Tennessee Construction Company and the persons financing the same. On May 11, 1905, a contract was entered into between Van Blarcom and defendant Pierce. One of the provisions of this contract provided as follows: "that the Tennessee Construction Company and the Tennessee Railway Company which it controls be placed under the control and management of a directory or a committee to be selected by the said H. C. Pierce and in which the said W. H. Thompson and said J. C. Van Blarcom and the creditors of both companies shall be fairly represented." By this contract Van Blarcom also agreed to immediately furnish to defendant Pierce an accurate statement of the financial affairs of the enterprises, and among other things a statement as to "the location of the securities belonging to the Railroad Company and to the Construction Company and the debts or obligations for which said securities have been pledged." Van Blarcom did not furnish Pierce with the information mentioned in the above contract and the record is silent as to what further efforts, if any, Mr. Pierce made to acquire this information.

Shortly after this contract was made turning the management of the Construction Company over to the direction of defendant Pierce, the Construction Company procured the services of Hon. Jos. W. Bailey to

negotiate a sale of the two railroad properties (The Nashville Terminal Company and Tennessee Central Railroad Company properties) and shortly thereafter and on, to-wit, July 7, 1905, the Tennessee Construction Company gave a written option of purchase on the two railroad properties to the Standard Trust Company of New York. The option provided that the purchaser pay certain fixed sums for the first mortgage bonds of the Terminal Company and the general mortgage bonds of the Railroad Company. The capital stock of the Terminal Company and the greater portion of the capital stock of the Railroad Company were to pass as a bonus with the purchase of said mortgage bonds. The option provided that the capital stock of the Terminal Company and a majority of the stock of the Railroad Company should be deposited with the Standard Trust Company of New York on or before September 1, 1905, and that the mortgage bonds of the two railroad properties should be deposited with the Colonial Trust Company of New York. The option was to run for a period of three years from July 1, 1905. At the time this option was entered into it was considered by all as merely a deferred purchase, and it was expected by all that the purchase would be ultimately closed and enough money realized to settle all of the outstanding obligations created by the construction of these two railway properties. Under this option the purchaser was given the right to operate the railway properties during the life of the option, and in turn was required to make certain payments of money which would carry the interest on the bonds during that time. On July 27, 1905, Van Blarcom forwarded by express to Hon. Joseph W. Bailey at New York City the 10,000 shares of the Nashville Terminal Company stock (the stock now in controversy) and said stock was deposited with the Trust Company under the terms of said optional agreement. It does not appear from the evidence whether or not other officers or directors of the plaintiff bank at that time knew that this stock was being forwarded by Van Blarcom. The attorney for the bank testified in this

case that shortly after this date it was called to his attention that the 10,000 shares of the Nashville Terminal Company stock were not in the bank and that he took the matter up immediately with Van Blarcom and asked him if the bank should not have a receipt for this stock. Van Blarcom replied to him that he thought the sale would go through, and that since under the option contract the stock did not particpate in the distribution of the purchase money, but that the money was to be paid out on the bonds, it would not be necessary to have a receipt for the stock. This witness further testified that in order that the bank might have some record of the transaction he prepared and Van Blarcom signed the following instrument:

"St. Louis, Mo., October 19th, 1905.

"For and in consideration of value received from The National Bank of Commerce in St. Louis, I hereby guarantee to said bank the payment of the following notes executed to it by the Tennessee Construction Company.

"One note for three hundred and fifty-two thousand dollars ($352,000) due on demand, dated July 1st, 1902, and payable to said bank or order.

"One note for one hundred and forty-eight thousand dollars ($148,000) due on demand, dated July 9th, 1902, and payable to said bank or order.

"One note for two hundred thousand dollars ($200,000) due on demand, dated October 15th, 1902, payable to B. F. Edwards, Cashier, or order.

"Said bank has agreed with the Tennessee Construction Company not to demand or require payment of said notes, or any of them, prior to June 1st, 1907, on condition that the interest thereon be promptly paid as agreed, and all of which said notes are secured by the following collateral:

"750 general mortgage 5% bonds of the Tennessee Central Railroad Company, of the denomination of one thousand dollars ($1,000) each.

"250 first mortgage 5% bonds of the Nashville Terminal Railroad Association of the denomination of one thousand dollars ($1,000) each.

"10,000 *shares of the capital stock of the Nashville Terminal Railroad Association of the par value of one hundred dollars* ($100) *each.*

"I hereby request that of the above collateral, you forward to, and deposit with, the Colonial Trust Company of New York, the following:

"750 general mortgage 5% bonds of the Tennessee Central Railroad Company of the denomination of one thousand ($1,000) dollars each; also 250 first mortgage 5% bonds of the Nashville Terminal

Railroad Association of the denomination of one thousand ($1,000) dollars each, and hereby approve your action upon my request, in delivering said 10,000 shares of the capital stock of the Nashville Terminal Railroad Association of the par value of one hundred dollars ($100) each to the Standard Trust Company of New York; all as provided in a certain contract entered into between the Tennessee Construction Company and the Standard Trust Company of New York and dated the 27th day of July, 1905.

"Notice to the undersigned of the acceptance of this guarantee is hereby expressly waived.

"In Witness Whereof, I have hereunto subscribed my name on this 19th day of October, A. D. 1905.

J. C. VANBLARCOM."

The purchaser after operating the property for nearly three years, failed to exercise its rights under the option agreement and the deal fell through. The Trust Company notified the Tennessee Construction Company to this effect in July, 1908.

The death of Mr. Van Blarcom occurred October 24, 1908.

On November 18, 1908, the Tennessee Construction Company through its president, Geo. O. May, issued a written order to the Standard Trust Company of New York, authorizing said Trust Company to deliver to defendant Pierce or order on demand all of the 10,000 shares of the capital stock of the Nashville Terminal Company. The Trust Company delivered this stock to Mr. Eben Richards, son-in-law and agent of defendant Pierce, on December 8, 1908.

Thereafter defendant Pierce held said shares of stock as collateral security for a debt which the Tennessee Construction Company owed him for past advancements as evidenced by a note of the Tennessee Construction Company dated November 17, 1908, in the sum of $600,000 due one day after date. Sometime in 1910 the plaintiff made repeated demands upon defendant for the return of the stock, which demands were refused.

About January, 1913, defendant notified the Construction Company that he intended to sell all the securities pledged him by that company (this would include the stock of the Terminal Company, now in controversy, and other securities). The Construction Company in order to avoid a foreclosure sale made an arrangement with Mr. Pierce whereby he received all of the equity of the Construction Company in said stock.

The $700,000 indebtedness of the Tennessee Construction Company to the plaintiff bank has never been paid. It appears from the evidence that the estate of Van Blarcom, who had become guarantor of the indebtedness, is insolvent.

The evidence as to the value of this stock (which it is alleged defendant converted) was substantially as follows:

The Nashville Terminal Company owns about fifteen miles of terminal tracks in or near the City of Nashville, Tennessee, and also owned switch tracks leading therefrom to local industries. There was also some evidence that the Terminal Company owned the capital stock and bonds of the Brier Hill Collieries Company, and also a franchise upon certain streets of the City of Nashville. It appears that the company had outstanding bonds to the amount of two million dollars. The first million dollars of bonds were issued and disposed of. Later an issue of three million dollars of bonds was authorized by the officers and stockholders of the company.

The deposition of defendant Pierce was offered in evidence by plaintiff as an admission against interest. In that deposition the defendant was being interrogated concerning the authorization of the increase of the bonded indebtedness of the Nashville Terminal Company to three million dollars, and in part he replied as follows:

"I was satisfied that the property (meaning the property of the Nashville Terminal Company) was worth $3,000,000 from representation made to me;

otherwise, I should not have consented to the issue of the increased amount of bonds.''

It was planned that out of this last issue the first was to be taken up, but it appears that this was never done, and only one million dollars on the last issue was ever issued, and it was issued to defendant Pierce to secure him for money advanced to the company. The remaining portion of the second mortgage bonds were never issued.

There was further evidence to show that this terminal property was very necessary to the proper operation of the Tennessee Central Railway Company; that the value of each of said railway properties depended more or less upon the right to use the other in connection therewith.

On February 11, 1913, an attorney-at-law representing the defendant Pierce wrote a letter to the private secretary of Mr. Pierce, which letter contained the following language: ''It (Nashville Terminal Company) has also outstanding one million capital stock on which dividends have been paid. The dividend was paid in October, 1912. The property of the Nashville Terminal Company is absolutely essential to the operation of Tennessee Central or N. C. and St. L. Railway, both of which companies now operate in Nashville. We had been given to understand that the physical property of the Nashville Terminal Company is worth at least three million dollars. Mr. H. C. Pierce owns the entire capital stock of the company and owns or controls the majority of the first mortgage bonds.''

For a year or two before this suit was brought the bank was trying to get defendant Pierce to surrender this stock to it on the theory that it was entitled to hold the same as pledgee for the security of the $700,000 loan of the Construction Company. During this controversy and on July 10, 1911, the personal attorney of defendant Pierce wrote a letter to the plaintiff bank refusing to surrender the 10,000 shares and in that letter used the following language: ''I refer personally to its (meaning the bank) demand that Mr. Pierce must

surrender the Nashville Terminal stock. This stock is well worth its par value of one million dollars and constitutes by far the greater part in value of the securities held by Mr. Pierce for his enormous financial guarantees and endorsements of the Tennesse Construction Company indebtedness.''

The author of this letter, testifying as a witness, stating that he desired to explain that letter, said: ''I don't believe in the first explanation to the court I explained the relations between the two properties, as far as Mr. Pierce personally is concerned. I said at the time that my opinion was that the stock was worth a million dollars, and in my opinion it was worth that then to Mr. Pierce, because of the fact that he controlled both of the companies, and inasmuch as he controlled both companies it was up to him to conserve his interest in the proposition, and neither one of the properties would do anybody any good unless the whole thing was sold. The control of both properties was in his own hands, that is, in a way; and I stick to my idea of what that would be worth to the person who controlled the Tennessee Central, he would have to have the Nashville Terminal because that is a property that consists of terminal facilities leading off of the belt line that belongs to the Railroad Company. Sandwiched in there, there is a bridge in between two sections of the Tennessee Central Railroad tracks. Now, the Terminal property isn't worth anything except in connection with the Tennessee Central.''

The defendant did not offer any contradictory evidence upon the value of the stock, but upon other points defendant's evidence tends to contradict much of the evidence offered by the plaintiff. It tends to show that plaintiff never had actual knowledge that the shares of the Terminal Company were ever deposited with the bank as collateral; that the bank did not notify the Trust Company in New York at the time the shares were deposited with the option contract, that it claimed any interest therein. The bank examiner of the St. Louis Clearing House examined plaintiff bank on April

13, 1918, and on July 8, 1909, and stated that no one connected with plaintiff bank mentioned that the bank had an interest as pledgee in the capital stock of the Terminal Company; that he does not think that he saw the memorandum in the handwriting of Mr. Matthews attached to the $700,000.loan; that one of the officers of the bank told him that the $700,000 loan would have to depend upon the collateral held by the bank. This witness stated that he did not assume to say that the Matthews memorandum was not there when he examined the bank, but merely that he had no recollection of the same. The cashier of the plaintiff bank on December 5, 1909, wrote defendant Pierce a letter concerning certain financial matters then pending between the bank and Pierce. Said letter contained the following language:

"Second: The bank will not require the payment of the notes of the Tennesse Construction Company, aggregating $700,00 the payment of interest on which is guaranteed by you, prior to January 1, 1911, upon the deposit of all of the capital stock of the Nashville Terminal as additional collateral to this loan, and the prompt payment of interest now due thereon, and quarterly thereafter, in the meantime."

That the plaintiff bank did not make any claim for this stock until about May 10, 1910. Defendant Pierce told the bank, after the controversy had arisen, that if they would convince his attorney that the bank was morally entitled to this stock he would surrender the same. The attorney went to the bank and examined all of the evidence which the bank showed him concerning its claim to this stock and he examined the notes representing the $700,000 loan, but the Matthews memorandum was not pinned to the notes at that time and the attorney never heard of the existence of said memorandum until depositions were taken in this case.

I. Much is said in appellant's brief about the inadmissibility of the Matthews memorandum which is set forth in the foregoing statement of facts. Con-

Admission
of Evidence.

cerning this point it is sufficient to say that this memorandum was admitted in evidence without objection and the point is therefore not properly saved for appellate review.

II. After carefully reviewing this entire record we have reached the conclusion that the trial court did not err in refusing to give defendant's instruction in the nature of a demurrer to the evidence.

Sufficiency
of Evidence.

As we understand appellant's position under this head it is: (1) that there was not sufficient evidence to support the finding that the stock in question was deposited as collateral with the plaintiff to secure the $700,000 loan; (2) even though the stock was so pledged, yet by subsequent action upon the part of the bank it surrendered whatever lien it theretofore held.

It must be borne in mind that this is an action at law and that the finding of the trial court if supported by substantial evidence is binding upon the appellate court. We have set forth much of the evidence in the foregoing statement and it is unnecessary to repeat the same here. We are of the opinion that the evidence set forth in the foregoing statement is sufficient to warrant the trial court, sitting as a jury, to find both that there had been a pledge of this stock to the bank and that the bank had never surrendered its lien thereon. Both of these questions presented issues of fact. It is of little concern whether this court, if it had the opportunity, would have found the facts the same or different from those found by the trial court. We are not at liberty upon this review to find the facts *de novo*, but are concerned (on the question now being discussed) merely with the problem of whether there was substantial evidence to support the findings which the trial court made. We are of the opinion that there was such evidence and we are therefore not warranted in interfering with the judgment rendered below.

III.  Neither are we able to agree with appellant's contention that the court erred in holding that this action was not barred by the five-year Statute of Limitations.  The evidence shows that this stock was not delivered into the possession of defendant until December 8, 1908.  This action was instituted April 12, 1913.  There was sufficient evidence to warrant a finding that the conversion of this stock did not occur until after it was delivered to defendant, or at least until within five years of the institution of this action.  This being an action at law and there having been a general finding of facts for plaintiff we are justified in presuming (where, as here, there is substantial evidence to support such finding), that the court found to exist all necessary facts, and therefore in the present instance that the court found that the conversion occurred within the five years next prior to the institution of this suit.  [4 C. J. 778.  Title: Appeal and Error, par. 2728 (7) and numerous cases therein cited.]

*Limitations.*

IV.  It is further contended that there was an entire failure to show that this stock had any substantial value and for this reason the recovery, if any, should have been limited to nominal damages.  Defendant's own testimony shows that in 1909, at the time the bonded indebtedness of the Nashville Terminal Company was increased from one million to three million dollars, *he* was satisfied the property of that company was worth three million dollars.  The attorney for defendant in a letter written in 1911 to the officers of the plaintiff bank, stating reasons why defendant should not surrender this stock to plaintiff, among other things said:  "This stock is well worth its par value of one million dollars."  This attorney testifying later in the case said that he was still of the opinion that this stock was worth one million dollars to defendant Pierce at the time he wrote the letter.  Defendant offered very little evidence on the question of the stock's value.

*Nominal Damages.*

Upon this and the other evidence mentioned in the foregoing statement the trial court was certainly justified in finding that the stock was worth at least $700,000. We therefore disallow appellant's present contention.

V. It is further contented that the court erred in refusing permission to defendant to file a second amended answer.

Defendant did not ask leave to file his second amended answer until about three months after the court had rendered judgment in the case. This was at a time, however, when the motion for a new trial was still pending. This second amended answer sets forth new matters of defense which were not pleaded in the answer upon which the case was tried.

The question of permitting amended pleadings to be filed is one resting largely within the discretion of the trial court. [Gale v. Foss, 47 Mo. 276; McGinnis v. McGinnis, 274 Mo. 285, l. c. 300.]

Whether an amended answer setting up new defenses should ever be permitted to be filed after the court has announced judgment and while the motion for a new trial is pending we need not decide, because unnecessary to a decision of the case, but we have no hesitancy in saying that the present record does not disclose any facts which would go to show that the trial court exercised other than a very sound discretion in refusing permission to file the amended answer under the conditions presented in the case at bar.

VI. Some abstract questions of law are discussed in the briefs of learned counsel, but we are of the opinion that the questions above discussed are the only ones raised in the briefs which have to do with the question of whether error was committed by the trial court.

From the foregoing it follows that the judgment should be affirmed.

It is so ordered. All concur.