## PIERCE v. NATIONAL BANK OF COMMERCE IN ST. LOUIS.*

## NATIONAL BANK OF COMMERCE IN ST. LOUIS v. PIERCE.

(Circuit Court of Appeals, Eighth Circuit. May 27, 1926.)

Nos. 6822, 6823.

1. **Pledges ⊜⟶31(1).**

Mere claim of right to hold securities, without wrongful taking or withholding, does not amount to conversion.

2. **Banks and banking ⊜⟶179—Claim by pledgee bank of right to hold securities for debt not covered by pledge did not amount to conversion.**

Where securities were pledged to bank to secure debt, its possession was rightful, and fact that, in addition to its rightful possession, it claimed right to hold them as security for another debt not covered by pledge, did not amount to conversion.

3. **Trover and conversion ⊜⟶44.**

No damage could occur because of conversion of bonds without value.

4. **Trover and conversion ⊜⟶35.**

In action for conversion of promissory note, or bond, its actual value is prima facie its face value, and burden of showing otherwise rests on defendant.

5. **Trover and conversion ⊜⟶40(6).**

Evidence held insufficient to overcome presumption that bonds alleged to have been converted were worth their face value.

*Rehearing denied August 10, 1926.

**6. Executors and administrators ⬥264(1, 2) —Guaranty ⬥104—Where joint guarantor paid interest, he acquired equity in collaterals superior to other guarantor's estate and creditors of estate could not insist that collaterals be first exhausted before recourse be had against estate, and payee, having filed claim and received dividend, could not thereafter voluntarily surrender dividend and hold joint guarantor liable (Rev. St. Mo. 1919, § 188).**

Where deceased had, jointly with another, guaranteed payment of note secured by collaterals not belonging to deceased, and after deceased's death other party made interest payments on loan he acquired equity in collaterals superior to deecased's estate, and creditors of estate could not insist that such collaterals be first exhausted, according to Rev. St. Mo. 1919, § 188, before recourse be had against estate, and where payee of note filed claim against estate and received dividends it could not thereafter voluntarily surrender dividends and hold joint guarantor liable for such amount.

**7. Guaranty ⬥74.**

Guarantor of interest on loan cannot claim credit for dividends declared on estate of joint guarantor, when they were not actually received by payee.

**8. Judgment ⬥828(3).**

Issue decided in state case between same parties cannot be again litigated.

**9. Appeal and error ⬥1022(2).**

Finding of master, confirmed by court, that alleged custom that collaterals pledged to secure indebtedness to bank did not secure indebtedness of pledgor to third parties acquired by bank subsequent to making of pledge *held* conclusive, when supported by evidence.

**10. Banks and banking ⬥179—Banker's lien on collaterals as security for notes of same company later obtained was junior and inferior to that of person holding title to collaterals subject to bank's pledge, of which title bank had knowledge.**

Where bank accepted construction company's notes in settlement of claim against estate of one of its officers, any banker's lien for payment of such notes on collaterals already held by it as security for construction company's indebtedness was junior and inferior to title of third person to such collateral, subject to pledge to bank, of which title bank had knowledge.

**11. Corporations ⬥1—Corporation is legal entity, distinct from individual members or stockholders, and property or rights acquired by it or liabilities incurred are those of legal entity, as distinguished from members composing it.**

Corporation is legal entity, distinct from its individual members or stockholders, and property or rights acquired or liabilities incurred by corporation are property, rights, and liabilities of such entity, as distinguished from members who compose it.

**12. Corporations ⬥1.**

Where recognizing corporation as distinct legal entity will justify wrong, protect fraud, or defend crime, law will view corporation as association of persons.

**13. Corporations ⬥1.**

Where bank dealt with corporation as distinct legal entity, and extended credit to it on faith of its promise, and not on faith of individual liability of stockholders, *held*, that there was no ground for not regarding corporatión as distinct entity.

**14. Corporations ⬥316(1).**

Pledge given by corporation to officer in consideration of advances made in good faith and for best interest of corporation is valid, and binding on corporation and its creditors.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Suit by Henry Clay Pierce against the National Bank of Commerce in St. Louis, wherein the defendant filed a cross-bill. From the decree, both parties appeal. Reversed and remanded, with directions.

H. S. Priest and John F. Green, both of St. Louis, Mo., for plaintiff.

George L. Edwards, of Kansas City, Mo., and William T. Jones, of St. Louis, Mo. (Edward J. White and Carter, Nortoni & Jones, all of St. Louis, Mo., on the brief), for defendant.

Before LEWIS and BOOTH, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. This is an appeal and a cross-appeal from a decree in a suit brought by Henry Clay Pierce against the National Bank of Commerce in St. Louis, for an accounting for certain collaterals held by the bank, wherein the bank filed a cross-bill to foreclose the lien of an alleged pledge of collaterals and for a deficiency judgment against Pierce.

In 1901, Jere Baxter and certain associates and J. C. Van Blarcom and certain associates formulated a plan for the acquisition, extension and consolidation of certain railroads in the states of Tennessee and Kentucky, so as to make a line of railroad extending from Emery Gap near Harriman, Tenn., as its eastern terminus, to Hopkinsville, Ky., as its western terminus, to be owned and operated by the Tennessee Central Railroad Company (hereinafter called Railroad Company). The plan also contemplated the construction of certain terminal facilities at Nashville, to be owned by the Nashville Terminal Company (hereinafter called Terminal Company) and to be operated by the Railroad Company under lease from the Terminal Company.

In February, 1901, Van Blarcom, Baxter, and N. C. Chapman incorporated, under the laws of the state of Missouri, the Tennessee Construction Company (hereinafter called Construction Company).

On September 17, 1901, the Nashville & Clarksville Railroad Company, the Nashville & Knoxville Railroad Company, the Tennessee Central Railway, and the Terminal Company entered into a contract, whereby they agreed that the corporate name of the Nashville & Clarksville Railroad Company should be changed to the Tennessee Central Railroad Company, that the Railroad Company should enter into a 99-year lease of the terminal facilities and properties of the Terminal Company, and that the Railroad Company should purchase and acquire all franchises and properties of the Nashville & Knoxville Railroad Company and the Tennessee Central Railway.

Thereafter the Construction Company entered into a contract with the Railroad Company, whereby it was agreed that the Construction Company should construct certain extensions of the railroads acquired and owned by the Railroad Company and certain betterments and additions thereto, and receive in payment therefor part of the capital stock and first mortgage bonds of the Railroad Company. The Construction Company also entered into a contract with the Terminal Company, whereby it was agreed that the Construction Company should construct certain terminal facilities for the Terminal Company at Nashville, Tenn., and receive in payment therefor the entire capital stock and first mortgage bonds of the Terminal Company.

In 1902, the Construction Company borrowed $700,000 from the bank, and to evidence the same executed and delivered to the bank three promissory notes payable on demand, one dated July 1, 1902, for $352,000, one dated July 9, 1902, for $148,000, and one dated October 15, 1902, for $200,000. To secure this loan (hereinafter referred to as the $700,000 loan), the Construction Company pledged to the bank first mortgage bonds of the Railroad Company (later changed to general mortgage bonds) of the face value of $750,000, first mortgage bonds of the Terminal Company of the face value of $250,000, and 10,000 shares of the capital stock of the Terminal Company of the par value of $1,000,000. The bonds were pledged at or about the time the loan was made. The stock was pledged July 27, 1905, as determined by a judgment rendered July 12, 1916, in a suit brought by the bank

against Pierce in the circuit court of the city of St. Louis, Mo., which was affirmed on appeal by the Supreme Court of Missouri. See National Bank of Commerce in St. Louis v. Pierce, 280 Mo. 614, 219 S. W. 578. This case will hereafter be referred to as the state case.

On November 17, 1908, the Construction Company executed and delivered to Pierce its collateral note for $600,000, by which it pledged to Pierce, subject to the prior pledge to the bank, the said general mortgage bonds of the Railroad Company of the face value of $750,000 and the said first mortgage bonds of the Terminal Company of the face value of $250,000. It also pledged to Pierce, without any recital of the prior pledge to the bank, said 10,000 shares of the stock of the Terminal Company. Notice of this note and pledge to Pierce was given to the bank in November, 1908. In January, 1913, Pierce foreclosed upon these collaterals, purchased them at the foreclosure sale on January 3, 1913, and has ever since been the owner thereof, subject to the pledge of them to the bank. Notice of the foreclosure and purchase thereunder by Pierce was given to the bank prior to November 14, 1919.

On July 16, 1903, Van Blarcom, who was then vice president of the bank and vice president of the Construction Company, signed in the following form, "W. H. Thompson, per V. B. Atty.," a note for $200,000, payable on demand to the order of B. F. Edwards, cashier, and delivered the same to the bank. At that time, Edwards was cashier, and Thompson was president of the bank. On July 17, 1903, the Construction Company executed and delivered to Van Blarcom its demand note for 200,000 and Van Blarcom indorsed and delivered the same to the bank as collateral to the $200,000 note dated July 16, 1903. Thompson died December 6, 1905, and his estate was administered in the probate court of the city of St. Louis. The bank filed a claim against the Thompson estate, based on the note signed "W. H. Thompson, per V. B. Atty." It was allowed without contest by the probate court July 5, 1914, for the sum of $305,166.67. From this allowance, the executor appealed to the circuit court of the city of St. Louis, Mo. Pending such appeal, a compromise of this claim was effected, by which the bank accepted in settlement thereof $100,000 in cash, first mortgage bonds of the Terminal Company of the face value of $50,000, two unsecured notes of the Construction Company, dated November 14, 1902, each for the sum of $100,000, both payable on demand

to the order of the Construction Company and indorsed by it, and the note of the Construction Company for $200,000, dated July 17, 1903.

The contract by which the stock and bonds above mentioned were pledged to secure the $700,000 loan was not in writing. The bank claimed that, continuously from 1902 down to the date of the trial below, a custom prevailed under which collaterals given to secure an indebtedness to the bank by a borrower were also pledged to secure any and all subsequent indebtedness of the borrower to the bank. From and after the date of the settlement between the bank and the Thompson estate which took place on April 9, 1914, the bank, under such alleged custom, claimed that the $750,000 general mortgage bonds, $250,000 Terminal Company bonds, and 10,000 shares of Terminal Company stock were pledged to the bank to secure the notes of the Construction Company accepted by the bank in the settlement of its claim against the Thompson estate.

Van Blarcom died October 24, 1908. While holding the $200,000 note of the Construction Company of July 17, 1903, as pledgee from Van Blarcom, the bank proved it as a claim against the Van Blarcom estate, based upon Van Blarcom's indorsement, and secured an allowance thereof on September 22, 1909, in the sum of $253,773.30. It collected dividends thereon as follows: July 31, 1917, $31,678.59; July 22, 1922, $7,151.72.

Pierce and Van Blarcom jointly executed two writings, one dated June 28, 1905, and one dated July 2, 1907, by which they guaranteed the payment of the interest on the $700,000 loan. The recited consideration of the first guaranty was that the bank should not demand payment of the loan prior to June 1, 1907. The recited consideration of the second guaranty was that the bank should continue to forbear requiring payment of the loan, but it fixed no definite period for such forbearance. Between January 2, 1913, and September 14, 1918, Pierce paid to the bank, under these guaranties, interest amounting in the aggregate to $182,792. The balance of the interest during that period was paid from interest collections made by the bank upon Terminal Company bonds held by it as collateral to the $700,000 loan. Interest at the rate of 6 per cent. per annum upon the amounts paid by Pierce from the dates of the respective payments to September 14, 1918, amounts in the aggregate to $31,739.08.

Van Blarcom guaranteed the payment of the $700,000 loan by several written guaranties. One was dated October 15, 1902, another October 19, 1905, and another June 28, 1907. Based on these guaranties of Van Blarcom, the bank filed its claim against the latter's estate, and the claim was duly allowed. On June 22, 1917, the bank entered into a written agreement with the executors and certain creditors of the Van Blarcom estate to the effect that, if it succeeded in collecting the $700,000 loan from the Pierce judgment or from the collaterals held by it to secure the loan, it would then distribute the dividends received by it on such claim pro rata among the general creditors of the estate including itself. On July 13, 1917, the bank received a dividend on this claim from the estate in the sum of $64,147.-96. On July 22, 1922, the executors of the Van Blarcom estate paid a second dividend of 2.626 per cent. on the claims allowed against that estate. This, on the bank's claim based on the $700,000 loan, would have amounted to $18,640.34. The bank neither demanded nor received this second dividend on such claim.

The 10,000 shares of stock of the Terminal Company came into the possession of the bank in October, 1903, as collateral to secure a note of the Construction Company to the bank in the sum of $500,000. This note was paid June 24, 1904. The bank claimed that this stock was again pledged to it on July 18, 1904, to secure the $700,000 loan. In 1905, the Construction Company entered into an option contract with the Standard Trust Company which contemplated the sale of all the first mortgage bonds and all the stock of the Terminal Company, general mortgage bonds of the Railroad Company of the face value of $8,000,000, and a majority of the capital stock of the Railroad Company. Such bonds and stock were deposited with the Colonial Trust Company of New York, and included therein were the bonds and stock theretofore deposited with the bank as collateral security. The proposed sale was not consummated, and the 10,000 shares of stock of the Terminal Company were delivered to Pierce on December 8, 1908. A controversy arose between the bank and Pierce as to these 10,000 shares of stock. Pierce claimed that they were collateral to the note of the Construction Company to him of $600,000, and that the bank had no claim thereto. As a result, on April 12, 1913, the bank brought the state case against Pierce for conversion of this stock and recovered a judgment against Pierce for $700,-000. On March 24, 1920, Pierce brought this

action to enjoin the enforcement of that judgment and for an accounting concerning the collaterals. The lower court dismissed Pierce's bill for want of equity. This court, pending an appeal from the order of dismissal, granted a temporary restraining order to preserve the status quo, upon condition that Pierce pay on the judgment the sum of $467,141.67, and give a bond in the sum of $350,000 to the bank to secure the payment of the balance on the $700,000 loan, if any should be found to be due. Pierce made the payment and gave the bond in compliance with the order of this court on June 8, 1920. This court, on appeal, reversed the order dismissing the bill, but refused to continue the temporary injunction. See Pierce v. National Bank of Commerce, 268 F. 487.

Prior to the commencement of the instant case, the bank offered to deliver to Pierce the general mortgage bonds of the Railroad Company of the face value of $750,000.

On November 14, 1919, without notice to Pierce, and without any foreclosure of its pledge, the Bank sold to the Chase National Bank of Chicago the Terminal Company bonds of the face value of $250,000 for the sum of $225,000, under a contract which provided that the bank should repurchase the bonds from the Chase National Bank on or before November 15, 1924, for the sum of $225,000 plus interest on said amount at the rate of 5 per cent. per annum from November 14, 1919. The bank gave no credit on the $700,000 loan on account of the proceeds derived by it from the sale of such collateral bonds. Pierce was not advised of this sale until June 8, 1920, the date when he paid the sum of $467,141.67 on the state case judgment. Prior to the sale of such bonds to the Chase National Bank, the bank had been fully informed by Pierce that he had become the owner of such bonds subject to the pledge of them to the bank to secure the $700,000 loan.

The cause was referred to a master, who heard the evidence and reported the same to the court, with his findings of fact and conclusions of law.

The master found:

That the evidence did not establish a custom that collaterals pledged by a borrower were also pledged to secure subsequent indebtedness of the borrower where such subsequent indebtedness came to the bank, not directly from the pledgor, but through purchase by the bank from another creditor of the pledgor.

That the bank converted the Terminal bonds, of the face value of $250,000, on the date of its sale of the same to the Chase National Bank, to wit, November 14, 1919.

That the general mortgage bonds of the Railroad Company, of the face value of $750,000, were of no actual value, and that the bank did not convert such bonds.

That Pierce was entitled to a credit on the notes held by the bank by reason of the dividend of $64,147.96 received by the bank from the Van Blarcom estate.

That Pierce was not entitled to a credit on account of the second dividend paid by the Van Blarcom estate, which the bank failed to collect.

That the right of Pierce to surrender the Terminal Company stock in satisfaction of the state case judgment had been determined adversely to Pierce in the state case, and could not be relitigated in the instant case.

That the bank was estopped to deny that the Construction Company was a corporate entity, and to assert that Pierce and his associates were liable as copartners upon the contracts made in the name of the Construction Company.

That the note for $600,000 and the pledge of collaterals to secure same, given by the Construction Company to Pierce, was entered into in good faith and for a valuable consideration.

In computing the interest on the sum of $225,000, which the master found was the value of the Terminal Company bonds on the date of the conversion, the master inadvertently used the date of March 19, 1920, instead of November 14, 1919, the date he found the bonds were converted.

The master concluded that, after deducting the credits to which Pierce was entitled, together with interest thereon to June 8, 1920, the payment made by Pierce to the bank on such date exceeded by $3,304.29 the amount due to the bank, and that Pierce was entitled to recover that amount from the bank, with interest thereon at 6 per cent. from June 8, 1920, and to have the general mortgage bonds of the Railroad Company delivered to him.

On exceptions to the master's report, the trial court sustained the findings and conclusions of the master, except as to the first dividend paid by the Van Blarcom estate, and, basing its conclusion on the provisions of section 188, R. S. Mo. 1919, sustained the exceptions of the bank to that item.

[1, 2] The first contention urged by Pierce here is that the date of the conversion of the $250,000 Terminal Company bonds should have been fixed as of April 9, 1914, the date when the bank claimed them as collateral to

the Construction Company notes received by it from the Thompson estate. At all times between April 9, 1914, and November 14, 1919, the bank had a right to hold and possess these collaterals which came to it from the Construction Company as security for the $700,000 loan. It did no act during that period with reference to these securities that was inconsistent with its rights as pledgee. The mere fact that, in addition to its rightful possession, it also claimed a right to hold them as security for the notes which came to it from the Thompson estate, did not, in our opinion, amount to a conversion. A mere claim of right to hold securities, without a wrongful taking or withholding of them, does not amount to a conversion. If the $700,000 loan had been paid, and the bank had then retained the collaterals, claiming them as security for the other notes, such act, under the authorities cited by counsel for Pierce, would have amounted to a conversion; but such were not the facts in the instant case. The bank's possession was rightful, and it did no act inconsistent with its rights as pledgee until the sale to the Chase National Bank on November 14, 1919. We therefore conclude that the conversion of the Terminal Company bonds took place on November 14, 1919.

[3] The second contention of Pierce is that the conversion of the Terminal Company bonds, a part of the collaterals pledged, amounted to a conversion of the whole of the collaterals. We find it unnecessary to determine this question. The master found that the general mortgage bonds were without actual value. This finding was confirmed by the trial court. It is supported by the evidence. Since the general mortgage bonds were without value, even if they were converted, Pierce suffered no damage on account thereof.

[4, 5] The third contention made by Pierce is that the value of the Terminal Company bonds should have been fixed at their face value, instead of $225,000. In an action for the conversion of a promissory note, bond, or like evidence of indebtedness, its actual value is prima facie its face value, and the burden of showing that its actual value is less than its face value rests upon the defendant. Thompson v. Metropolitan Bldg. Co., 95 Wash. 546, 164 P. 222, 224; Doeren v. Krammer et al., 141 Minn. 466, 170 N. W. 609, 611; Peerless Fire Ins. Co. v. Barcus (Tex. Civ. App.) 227 S. W. 368, 369; Hoyt v. Stuart et al., 90 Conn. 41, 96 A. 166, 168; Healey v. Flammia, 96 Conn. 233, 113

A. 449, 450; Lyle v. McCormick Harvesting Mach. Co., 108 Wis. 81, 84 N. W. 18, 21, 51 L. R. A. 906; Hayes et al. v. Massachusetts Mut. Life Ins. Co., 125 Ill. 626, 18 N. E. 322, 327, 1 L. R. A. 303; Hersey et al. v. Walsh, 38 Minn. 521, 38 N. W. 613, 8 Am. St. Rep. 689; Peninsular Bank of Detroit v. Citizens' Nat. Bank of Knoxville, 186 Iowa, 418, 172 N. W. 293, 295, 19 A. L. R. 547; American Surety Co. of New York et al. v. Hill County (Tex. Civ. App.) 254 S. W. 241, 249, 267 S. W. 265; Kansas City Casualty Co. v. Westport Ave. Bank, 191 Mo. App. 287, 177 S. W. 1092, 1094; Shewalter v. Wood (Mo. App.) 183 S. W. 1127, 1129; Good Roads Machinery Co. v. Broadway Bank (Mo. App.) 267 S. W. 40, 42; Revert v. Hesse et al., 184 Cal. 295, 193 P. 943, 947. In the state case, the court found that the value of the stock of the Terminal Company on December 8, 1908, the date of the conversion thereof by Pierce, was $70 per share. The sale to the Chase National Bank which constituted the conversion was for $225,000. This sale, however, was in no sense a sale in the open market. It was more in the nature of a loan. The bank contracted to repurchase the bonds from the Chase National Bank at the same price for which they were sold, with accrued interest at 5 per cent. on or before November 15, 1924. The bank actually repurchased the bonds under this contract April 26, 1920. Because of the circumstances and conditions surrounding the sale to and the repurchase from the Chase National Bank, the price at which the bonds were sold and repurchased is of little evidentiary value in determining the actual market value of the bonds on November 14, 1919. It is our opinion that there is no evidence in the record sufficient to overcome the presumption that these bonds were worth their face value.

The fourth contention made by Pierce is that the court erred in denying credit on account of the dividend received by the bank from the Van Blarcom estate, and that the master and court erred in not allowing credit on account of the second dividend in the sum of $18,640.34, which the bank failed to demand and collect. The trial court predicated its disallowance of credit for the first dividend upon the provisions of section 188, R. S. Mo. 1919, which, in part, reads as follows:

" * * * And when a claim is allowed against an estate which is secured by mortgage, deed of trust or other lien held by the creditor, the same may be allowed as other

claims, but shall not be paid until such security held by the claimant has been exhausted; but if such security be not sufficient to pay off and discharge the debt of such creditor, then such creditor for the residue of his debt shall be entitled in common with other creditors to have the same paid out of the estate."

This statute was enacted for the benefit of unsecured creditors.

In Darr v. Thomas, et al., 127 Mo. App. 1, 106 S. W. 95, referring to this statute, the court said:

"It would therefore seem to be apparent that section 191 should not be construed with literal preciseness, but should be considered with other portions of the statute and kept in harmony with them and be given a meaning which is reasonable and will effectuate its evident purpose. The true construction of that statute is that it is an enactment in the interest of unsecured creditors, and so we announced in Knight v. Newkirk, 92 Mo. App. 258. Ordinarily a secured creditor can lay by his security and go upon the general estate of his debtor. He may hold his security in reserve and only call it into service for whatever he fails to realize by the ordinary proceeding to collect his claim. Day v. Graham, 97 Mo. 398 [11 S. W. 55]; Edmonson v. Phillips, 73 Mo. 57; Greenwell v. Heritage, 71 Mo. 459. This statute compels him to reverse the order of such proceeding and first utilize his security, thus not jeopardizing or hindering unsecured creditors except for what balance, if any, he may fail to get out of such security."

In Knight v. Newkirk, 92 Mo. App. 258, the same court said:

"Now the statute aforesaid was enacted in the interest of creditors; and heirs, as such, nor the executor acting for them, have no right to call that law to their aid."

[6] We do not believe the provisions of the statute apply to a state of facts such as exists in the instant case. The liability of the Van Blarcom estate arose because of the guaranties executed by Van Blarcom to pay the principal and interest of the $700,000 loan. The collaterals pledged did not belong to the Van Blarcom estate, but first belonged to the Construction Company and later to Pierce. Under the guaranties for the payment of the interest on the $700,000 loan executed jointly by Van Blarcom and Pierce, the latter between January 2, 1913, and September 14, 1918, made payments of interest on such loan amounting in the aggregate to $182,792. The Van Blarcom estate under

such guaranties was liable to Pierce for $91,-396, one-half of such payments, together with the accrued interest thereon. To that extent at least, Pierce had an equity in the collaterals superior to any rights of the Van Blarcom estate. Under such a state of facts the general creditors of the Van Blarcom estate could not insist, as against Pierce, that such collaterals be first exhausted before recourse should be had against the estate, without the estate first paying to Pierce the amount due him on account of the interest paid by him. The dividend of $64,147.96 was insufficient to reimburse Pierce for such interest payments. In the absence of action by Pierce to secure the marshaling of liens, the bank had the right to resort either to the Van Blarcom estate or to the collaterals to satisfy its claim. But, having elected to file its claim against the Van Blarcom estate and secure the allowance thereof, and having received a dividend thereon in the sum of $64,147.96, the bank could not thereafter voluntarily surrender such dividend and hold Pierce liable for the amount thereof.

[7] With reference to the second dividend, the bank not actually having received payment thereof, it is our opinion that Pierce cannot claim credit therefor.

[8] The final contention made by Pierce is that the court should have compelled the bank to accept the return of the 10,000 shares of stock of the Terminal Company in cancellation of the judgment obtained by it against Pierce for the conversion thereof. That issue was squarely presented and decided in the state case, and the doctrine of res adjudicata prevents the parties from again litigating it in this suit.

This brings us to the contentions made by the bank under its counterclaim:

[9] The first contention of the bank is that the collaterals given originally to secure the $700,000 loan were also collateral to the other notes of the Construction Company acquired by the bank in the settlement with the Thompson estate. The bank bases this contention upon an alleged custom that, where collaterals were pledged to secure an indebtedness of the pledgor to the bank, they also secured all subsequent indebtedness of the pledgor to the bank. This contention is foreclosed by the finding of the master, confirmed by the court, and supported by the evidence, that no such custom existed as to the indebtedness of the pledgor to third parties purchased by the bank subsequent to the making of the pledge.

[10] The second contention is that it had the right to hold the collaterals as security to the notes obtained in the settlement with the Thompson estate under a banker's lien. At the time the bank acquired such notes, Pierce held the title to the general mortgage bonds and the Terminal Company bonds subject to the pledge to the bank to secure the $700,000 loan. The bank had notice of Pierce's title to these collaterals when it took such notes, and the banker's lien upon such collaterals to secure such notes, if any it had, was junior and inferior to Pierce's title to such collaterals.

The third contention of the bank is that Pierce, Van Blarcom, and their associates in the railroad enterprise were in fact copartners, and that the Construction Company was not a bona fide corporation, but merely a cloak under which such alleged copartners transacted business and borrowed moneys for the financing of the railroad enterprise.

The master found: That during all of the period of time, from shortly after the organization of the Construction Company down to the date of the commencement of the present suit, the bank, with full knowledge of the facts, dealt with the Construction Company and with Pierce and his associates, as though the Construction Company was a legal corporate entity, and entered into contracts with the Construction Company in its corporate name, under the terms of which the Construction Company alone was bound; that, at the time the $700,000 loan was made, the Construction Company was a customer of the bank and was conducting with the bank a general banking business, whereby it deposited money with the bank, drew against said deposits from time to time, borrowed money from the bank, executed notes to evidence such loans, and secured such notes from time to time by collaterals, all in the corporate name of the Construction Company; and that the bank was estopped to assert that the $700,000 loan was not the debt of the corporation, for which it alone was primarily liable.

The record discloses that, although the bank loaned the Construction Company large sums of money from time to time, evidenced by notes executed in its corporate name, that all of the Construction Company's indebtedness to the bank has been fully paid, except the notes which the bank obtained in the settlement with the Thompson estate. The bank dealt with the Construction Company as a corporate entity. It extended credit to the corporation. It contracted with the Construction Company in its corporate name. It contracted with Pierce and Van Blarcom, by agreements wholly separate and distinct from those executed by the Construction Company in its corporate name, as persons secondarily liable for the debts of the Construction Company. It received and retained the benefits of such contracts. With full knowledge of the facts it recognized the Construction Company as a distinct, legal corporate entity, and contracted with it as such. [11] The general doctrine is well established that a corporation is a legal entity distinct from its individual members or stockholders, and that the property or rights acquired or the liabilities incurred by the corporation, are the property, rights, and liabilities of such legal entity as distinguished from the members who compose it. Donnell v. Herring-Hall-Marvin Safe Co., 208 U. S. 267, 28 S. Ct. 288, 52 L. Ed. 481; Peterson v. Chicago, R. I. & P. Ry. Co., 205 U. S. 364, 27 S. Ct. 513, 51 L. Ed. 841; Hollins v. Brierfield C. & I. Co., 150 U. S. 371, 382, 14 S. Ct. 127, 37 L. Ed. 1113; Pullman's Palace Car Co. v. Mo. Pac. Ry. Co., 115 U. S. 587, 6 S. Ct. 194, 29 L. Ed. 499; Macon Exchange Bank v. Macon Construction Co., 97 Ga. 1, 25 S. E. 326, 33 L. R. A. 800. 14 C. J. p. 52, § 3. In Donnell v. Safe Co., supra, the Supreme Court, speaking through Mr. Justice Holmes, said:

"Philosophy may have gained by the attempts in recent years to look through the fiction to the fact and to generalize corporations, partnerships, and other groups into a single conception. But to generalize is to omit, and in this instance to omit one characteristic of the complete corporation, as called into being under modern statutes, that is most important in business and law. A leading purpose of such statutes and of those who act under them is to interpose a nonconductor, through which, in matters of contract, it is impossible to see the men behind."
[12, 13] But to this general rule there are certain exceptions. The existence of the corporation as a distinct entity is a legal fiction, and where to recognize the corporation as a distinct legal entity will justify wrong, protect fraud, or defend crime, the law will disregard this fiction and view the corporation as an association of persons. McCaskill Co. v. U. S., 216 U. S. 504, 30 S. Ct. 386, 54 L. Ed. 590; U. S. v. United Shoe Machine Co. (D. C.) 234 F. 127; Smith v. Moore, 199 F. 689, 118 C. C. A. 127; Linn & Lane Timber Co. v. U. S., 196 F. 593, 116 C. C. A.

267; In re Watertown Paper Co., 169 F. 252, 94 C. C. A. 528; U. S. v. Milwaukee Refrigerator Transit Co. (C. C.) 142 F. 247; Fletcher, Cyclopedia of Corporations, vol. 1, § 42; 14 C. J. p. 61, § 22. But the facts in the instant case do not bring it within any recognized exception to the general rule. To regard the Construction Company as a distinct legal entity here will not justify wrong, protect fraud, accomplish an illegal act, or result in any injustice to the bank, which dealt with the corporation as a distinct legal entity and extended credit to it upon the faith of its promise, and not upon the faith of any individual liability of the persons owning its stock.

[14] The final contention made by the bank is that the pledge given by the Construction Company to Pierce was invalid because of Pierce's relation to the Construction Company. The record shows that the Construction Company received the benefit of large advances of funds made by Pierce; that the note and pledge in question was executed by the Construction Company, acting through George O. May as its president, for a valuable consideration; and that Pierce, in making the advances and accepting the note and pledge therefor, acted in good faith and for the best interests of the Construction Company. This being true, the pledge is valid and binding, both upon the Construction Company and the bank.

We therefore conclude that Pierce was entitled to credit on account of the conversion of the Terminal Company bonds in the sum of $250,000, with interest from November 14, 1919, to June 8, 1920, at the rate of 6 per cent. per annum, and that he was entitled to credit on account of the dividend received by the bank from the Van Blarcom estate in the sum of $64,147.96, together with interest thereon at the rate of 6 per cent. per annum from July 13, 1917, to June 8, 1920, at the rate of 6 per cent. per annum.

After allowing the foregoing credits, the payment made by Pierce to the bank on June 8, 1920, exceeded the amount due in the sum of $33,841.79. Pierce is entitled to judgment against the bank for that amount, together with interest at the rate of 6 per cent. per annum from June 8, 1920, until paid.

The cause is reversed and remanded, with instructions to modify the judgment and decree in accordance with this opinion. The costs on appeal will be taxed equally against the parties hereto. It is so ordered.