## UNITED STATES v. DAVIDSON.
### No. 10483.

Circuit Court of Appeals, Fifth Circuit.
Dec. 20, 1943.

Norman M. Littell, Asst. Atty. Gen., Frederick William Smith and Vernon L. Wilkinson, Attys., Department of Justice, all of Washington D. C., Clyde O. Eastus, U. S. Atty., and W. P. Walker, Asst. U. S. Atty., both of Fort Worth, Texas, for appellant.

Riley Strickland and Tom Seay, both of Amarillo, Tex., for appellees.

Before SIBLEY, HOLMES, and WALLER, Circuit Judges.

HOLMES, Circuit Judge.

This action was instituted by the United States to enjoin the appellees from collecting taxes assessed for the years 1937, 1938, and 1939, by various political subdivisions of the State of Texas, against a grain elevator at Amarillo, Texas. The basis of the claim for relief was that the property belonged to the United States from and after November, 1936, and was exempt from taxation.

Appellees admitted that the assessments for 1938 and 1939 were void, but contended that the United States did not acquire legal or equitable title to the property until February 24, 1937; that the assessment for 1937 became a lien as of January 1, 1937, at which time the property was subject to taxation; and by counterclaim they demanded a judgment of foreclosure of the tax liens for 1937. The court below denied the injunctions and entered a decree of foreclosure; the Government has appealed.

Farmers National Warehouse Corporation, a wholly-owned subsidiary of Farmers National Grain Corporation, held the legal title and was in possession of the property on June 12, 1936. Both corporations were organized and financed by the United States under the Agricultural Marketing Act of June 15, 1929, but they were not agencies of the United States, and their properties were subject to state taxation. On June 12, 1936, the parent corporation en-

tered into a contract with the Farm Credit Administration whereby it was agreed that all assets of the grain corporation and its subsidiaries, except certain properties expressly retained, should be transferred to the F. C. A. in consideration of the rendition of financial assistance and the cancellation of certain obligations of the grain corporation to the Government, but the contract was subject to approval by the Secretary of the Treasury, which was not finally given until November 7, 1936. The grain elevator at Amarillo was one of the properties to be transferred to the F. C. A. under said contract. It was contemplated that some time would be required to execute the contract, so it was agreed that each act in consummation of the agreement should be executed as of June 30, 1936.

On October 30, 1936, the United States leased the grain elevator properties to the parent corporation. On October 31, 1936, the parent corporation conveyed by deed to the United States "all assets" owned by the parent corporation on June 30, 1936, except those assets retained under the agreement. The subsidiary conveyed, by deed to its parent dated November 7, 1936, "all assets" belonging to the subsidiary as of the close of business on June 30, 1936. Finally, on February 24, 1937, the subsidiary by quitclaim deed conveyed to the United States the elevator properties at Amarillo.

 This court unanimously agrees with the court below that legal title to the grain elevator did not vest in the United States until February 24, 1937. The law recognizes a corporation to be a legal entity separate and apart from its stockholders, and the agreement of June 12, 1936, made by the parent corporation, was not the act of the subsidiary and was not binding upon it.[1] The only conveyance made by the parent corporation, pursuant to its agreement, conveyed assets owned by the parent corporation on June 30, 1936, at

which time title to and possession of the grain elevator was in the subsidiary. The conveyance made November 7, 1936, as of June 30, 1936, from the subsidiary to the parent, like all of the conveyances mentioned except the quitclaim deed of February 24, 1937, did not particularly describe any property; the conveyance was of "all of its assets as at the close of business on June 30, 1936". In Texas an instrument purporting to convey land must furnish the means of determining with reasonable certainty what land is involved; if it does not, the conveyance is void.[2] If, however, a transfer by the subsidiary of "all its assets" is to be taken as including all its land, still this after-acquirement by the parent of title to this elevator would not pass legal title to the Farm Credit Administration by virtue of the conveyance previously made to the latter by the parent, because that conveyance was expressly confined to assets that the parent owned on June 30, 1936, and did not purport to convey this elevator.

 It also appears that most of the instruments executed in 1936 bore no acknowledgment, and none of them was filed for record. Article 6627 of Vernon's Annotated Texas Statutes provides that all conveyances of land shall be void as to all creditors and subsequent purchasers for value without notice unless they are acknowledged and filed for recording as required by law. This statute applies to a creditor who has acquired a lien by operation of law upon the land without notice of an unrecorded conveyance, and confers upon such lienor a right superior to that of the grantee in the conveyance.[3]

 A majority of this court agrees with the trial court that the equitable title was not in the United States prior to February 24, 1937. In Texas, as elsewhere, an equitable title is a right, enforceable in equity, to have the legal title to real estate, or the fruits thereof, transferred to the owner of the right.[4] It is doubtful wheth-

[1] Sabre v. United Traction & Electric Co., D.C., 225 F. 601; Pierce v. National Bank of Commerce, 8 Cir., 13 F.2d 40; Marr v. Tumulty, 256 N.Y. 15, 175 N.E. 356; Ayer & Lord Tie Co. v. Commonwealth, 208 Ky. 606, 271 S.W. 693; 1 Fletcher's Cyclopedia on Corporations, 118, 119.

[2] Osborne v. Moore, 112 Tex. 361, 247 S.W. 498; Smith v. Sorelle, 126 Tex. 353, 87 S.W.2d 703; Smith v. Griffin, 131 Tex. 509, 116 S.W.2d 1064; 14 Tex.Jur. 987.

[3] Shear Co. v. Currie, 5 Cir., 295 F. 841; In re Lindahl, D.C., 59 F.2d 91; Underwood v. United States, 5 Cir., 118 F.2d 760; Ayres v. Duprey, 27 Tex. 593, 86 Am.Dec. 657; McKamey v. Thorp, 61 Tex. 648; Hirt v. Werneburg, Tex.Civ. App., 191 S.W. 711.

[4] Citizens National Bank v. Commissioner, 8 Cir., 122 F.2d 1011; Harris

er any of the instruments of conveyance executed prior to 1937 were sufficient under Texas law, even as between the original parties thereto, to vest an enforceable equitable right to the realty in the United States;[5] but we prefer to rest our decision on another ground. The agreement upon which reliance is placed was a bilateral contract imposing obligations upon both the parties thereto, and there is nothing to indicate that the obligations of one were to be performed before those of the other. The record contains no evidence to establish that the United States or any of its agencies have yet performed the contractual obligations undertaken by it. Under such circumstances a court of equity has no power to compel performance until the one demanding it has matured his right thereto by performance, or tender of performance, of all conditions precedent to the creation of an equitable right in him.[6]

Since the United States had neither legal nor equitable title until February 24, 1937, the property was subject to state taxation on January 1, 1937. It is conceded that taxes become a lien on taxable property on January 1st of the year for which they are levied.[7] The remaining question, therefore, is whether appellees were entitled in this proceeding to the decree of foreclosure for the enforcement of their liens. Appellees recognize that the sovereign immunity from suit of the United States would preclude any suit against it or its property for enforcement of the lien in the court below, but they contend that the act of the sovereign in bringing the injunction suit conferred jurisdiction upon the court to entertain the counterclaims for foreclosure and to administer full and complete justice upon the subject matter of the litigation. Reliance is placed upon the

case of The Thekla, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313, in support of this contention.

In the Thekla case the court said that, when the United States comes into court to assert a claim, it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter; that the absence of legal liability, in a case where but for its sovereignty it would be liable, does not destroy the justice of the claim against it. It is a familiar rule, however, that the language of an opinion must be construed in the light of the particular facts of the case. As was pointed out in United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L. Ed. 888, decision in the Thekla case turned upon a relationship characteristic of claims for collision in admiralty, in which libels and cross-libels are one litigation, and it is necessary to determine both libels in order to determine the one liability for the collision. The court expressly disavowed any intention to disturb the settled rulings in regard to sovereign immunity, namely, that a claim upon which no original suit may be brought against the sovereign may not be asserted as a counterclaim.[8] Jurisdiction of the counterclaims here asserted is controlled by the general postulate that no suit may be brought against the United States unless specific statutory consent has been given.[9]

For these reasons the United States was not entitled to the injunctive relief sought, and the counterclaims of the appellees should have been dismissed. The decree is modified by striking therefrom the recoveries of money and foreclosure of tax liens against the property in controversy under the counterclaims; and as

---

v. Mason, 120 Tenn. 668, 115 S.W. 1146, 25 L.R.A.,N.S., 1011; Tanner v. Imle, Tex.Civ.App., 253 S.W. 665; Ayres v. United States, 42 Ct.Cl. 385; Johnson v. Wood, 138 Tex. 106, 157 S.W.2d 146.

5 Cf. Continental Supply Co. v. Missouri, K. & T. Ry. Co., Tex.Com.App., 268 S.W. 444; Patton v. Rucker, 29 Tex. 402, 409; O'Herin v. Neal, Tex.Civ.App., 56 S.W.2d 1105.

6 Johnson v. Wood, 138 Tex. 106, 157 S.W.2d 146; 58 Corpus Juris, 1079, 1080, 1083. Cf. Taylor v. Kaufman, Tex. Civ.App., 267 S.W. 526; Barker v. Klingler, 302 Mich. 282, 4 N.W.2d 596.

7 Carswell & Co. v. Habberzettle, 39 Tex.Civ.App. 493, 87 S.W. 911. Cf. Unit-

ed States v. Alabama, 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327.

8 Nassau Smelting Works v. United States, 266 U.S. 101, 45 S.Ct. 25, 69 L. Ed. 190; Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; United States v. United States Fidelity Co., 309 U.S. 506, 60 S.Ct. 653, 84 L. Ed. 894.

9 Stanley v. Schwalby, 162 U.S. 255, 16 S.Ct. 754, 40 L.Ed. 960; State of Kansas v. United States, 204 U.S. 331, 27 S.Ct. 388, 51 L.Ed. 510; United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888; Moody v. Wickard, App.D.C., 136 F.2d 801.

thus modified it is affirmed. No costs are awarded against the United States.

Modified and affirmed.

SIBLEY, Circuit Judge (concurring).

The owner of the elevator, a private corporation, is, by a series of irregular instruments, continued in possession as a lessee, using the elevator as before. The State is protecting the property and its commercial use as before, but is to be denied its usual recompense in taxes. It is a startling proposition to me that an agency of the United States, without Congressional authority to do that very thing, can acquire a series of commercial properties and continue them in commercial use by commercial users and extinguish State taxation of them by means of the governmental immunity of the United States.

Certain it is that taxation is the rule and immunity the exception, and that immunity must be positively and clearly shown. I do not think, for the reasons stated in the opinion, that an immunity is positively and clearly shown on Jan. 1, 1937, by the confused and uncertain evidence offered. For this additional reason, I think the judgment denying the immunity ought to be affirmed.

WALLER, Circuit Judge (concurring in part and dissenting in part).

I concur in the majority view that a decree for the foreclosure of the asserted tax lien could not be entered against the United States, nor could costs be awarded against it. I further agree that the United States did not have the legal title on January 1, 1937. But it is my conclusion that the equitable title was in the United States prior to the above date and, therefore, the property was not subject to taxation on that date.

A fuller statement of the facts than appears in the majority opinion is considered necessary in order to present my views understandingly.

A factual recapitulation reveals the following sequence of events:

(a) On June 12, 1936, the Grain Corporation, the sole stockholder of the Warehouse Corporation, agreed to transfer, as of June 30, 1936, to the Farm Credit Administration all of its assets and all of the assets of its wholly-owned subsidiary and to cause its subsidiary to perform whatever acts were necessary to accomplish the transfer.

(b) A conveyance on October 31, 1936, from the Grain Corporation to the United States of all the assets owned by it on June 30, 1936, "in fulfillment of the agreement of June 12, 1936", and a covenant to take such action and execute such further instruments as may be necessary.

(c) An instrument dated the 7th day of November, 1936, between the Warehouse Corporation and the Grain Corporation, conveying to the Grain Corporation all of the assets of the Warehouse Corporation as of the close of business June 30, 1936, in express recognition of, and for the purpose of carrying out, the agreement of June 12, 1936, between the Grain Corporation and the Farm Credit Administration.

(d) A lease from the United States to the Grain Corporation, dated October 30, 1936, but as of June 30, 1936, of the Amarillo Terminal at Amarillo, Texas, conformable to the initial contract.

(e) A lease back from the Grain Corporation to the Warehouse Corporation, dated November 7, 1936, of the Amarillo, Texas, elevator, and other elevators and warehouses listed in the lease from the United States to the Grain Corporation.

(f) The quit claim deed, dated February 24, 1937, as of October 31, 1936, from the Warehouse Corporation to the United States, specifically describing the property in question.

The lower Court, and the majority of this Court, have concluded that the foregoing transactions did not place the equitable title to the premises in the United States on or before January 1, 1937, at which time the taxes in Texas became a lien upon real estate. It was the view of the lower Court, which seems to be shared in by the majority here, that the several agreements between the United States and the Grain Corporation and the Warehouse Corporation failed sufficiently to describe the premises so as to vest an equitable title in the Government, or so as to have entitled the Government to the specific performance of the contract, or so as to have complied with the statutory requirements of Texas that instruments purporting to convey land should be in writing, and that the first instrument meeting such requirement was the deed of February 24, 1937, after the lien for taxes had matured. Upon these considerations they hold that the Government was not entitled to have an injunction against the enforcement of the taxes.

It seems to be conceded, as it should be, that if the Government had the equitable title the lands would not be subject to taxation even though the Government was not seized of the legal title.

Whether or not specific performance could be had by the claimant is not the exclusive test of the ownership of an equitable title. There are numerous instances where the owner of an equitable title might not be able to enforce specific performance. Equitable rights in property may rest in parol. The equitable title might be in a party by virtue of a constructive or resulting trust, or by operation of law outside of contract.

"An equitable title exists where the legal title is vested in one person and the beneficial interest inures to another person, who may be named in the deed or who may not be named at all, whose right may exist by parol. Beringer v. Lutz, 188 Pa. 364, 41 A. 643, 644." 15 Words and Phrases, Perm. Ed. 63.

"An equitable title is 'a right or interest in land, which, not having the properties of a legal estate, but being merely a right of which courts of equity will take notice, it requires the aid of such court to make it available.'" Sebring Co. v. O'Rourke, 101 Fla. 885, 134 So. 556, 559; Pogue v. Simon, 47 Or. 6, 81 P. 566, 114 Am.St.Rep. 903, 8 Ann.Cas. 474; 1 Bouv. Law Dict., Rawles Third Revision, p. 680.

In 15 Words and Phrases, Perm.Ed., p. 64, we find the following definition: "Equitable title is a right imperfect at law, but which may be perfected by the aid of a court of chancery * * * by compelling parties to do that which in good faith they are bound to do, or removing obstacles interposed in bad faith to the prejudice of another."

An application of the test of whether specific performance could be decreed in the present case is altogether inapt. Cases for specific performance of land sale contracts arise between the parties to the contract, or their privies, in which the parties defendant raise the issue of insufficient description. In the present case neither party to the contract has contended that the description is insufficient. In fact, the descriptions in the various instruments appear to have been entirely satisfactory to the parties to the contracts. Each party knew what property was intended to be conveyed. The Tax Collector, a stranger,

seeks to raise the question, when the sufficiency of description was never raised by the parties, but on the contrary the owner of the legal title, in due course, executed a deed by proper description, confirming, ratifying, and making certain the description and the intent of the parties in the initial and subsequent instruments. It is difficult to see how a third party, who was neither a creditor nor purchaser, could raise the question of description when the parties to the contract were satisfied with it and carried out the contracts without controversy. The Tax Collector does not stand in the relation of an innocent purchaser or creditor. He is not interested in the rights of individuals but has a lien on the property of either party to a land contract, and the fact that the property of the United States is not the subject of taxation does not invest him with a right to question the contract. Even in a suit for specific performance wherein the description was general and indefinite, if both parties to the contract were in agreement that the premises in controversy were definitely known and understood by them, no Court would refuse specific performance of the contract on the ground of insufficiency of the description.

Where mutual mistake in the description is the only defect in an instrument the purchaser would resort to a proceeding for the reformation of the instrument rather than its specific performance.

The intent, purpose, and acts of the parties are the determinative factors in the creation of an equitable title—not the effectiveness of specific performance. It is possible for one to be the owner of an equitable title and be without any remedy because of lack of proof or because of intervening equities of third parties.

Nor is it necessary in this case to resort to the maxim, "Id certum est quod certum reddi potest", because the parties to the contract appear to have experienced no uncertainty as to description, and especially when the uncertainty was later reduced to certainty by a definite description of the property, which expressly related back to October 31, 1936, thereby converting the equitable title into a legal title.

The Government's claim to an equitable title is not dependent solely upon the deed from the Grain Corporation to the Government under date of October 31, 1936. It will be remembered that on June 12, 1936,

the Grain Corporation obligated itself to transfer all of its assets to the United States and to cause its subsidiaries to perform such acts as would bring about the transfer to the United States of all assets of the subsidiaries. It is true that the title to the Amarillo elevator site was then in the Warehouse Corporation, and it is true that the deed from the Grain Corporation to the United States under date of October 31, 1936, did not undertake to convey any property other than that owned by the Grain Corporation. Nevertheless, since the Grain Corporation owned all of the stock in the Warehouse Corporation, and, therefore, had complete power to operate the affairs of the latter, so long as the rights of innocent third parties were not invaded, it was bound by its contract of June 12, 1936, to cause a conveyance to be made from the Warehouse Corporation. It had all the stock of the Warehouse Corporation, which was not shown to be insolvent, and it could vote the stock for the sale of the corporation property. It, as sole stockholder, could thus order the directors and officers to sell. Certainly the sole stockholder of a corporation, in the absence of fraud or the intervening rights or equities of third parties or creditors in due course, has the right to bind its wholly-owned corporation to a contract to convey its property for a valid consideration.[1] It certainly could not be disputed that the sole stockholder of a corporation is at least an authorized agent of the corporation in such circumstances. In this case the sole stockholder of the subsidiary agreed with the United States on June 12, 1936, to transfer its assets to the United States and to cause its subsidiary to perform such acts as to accomplish the transfer of the assets of its subsidiary. On November 7, 1936, it entered into a contract as of June 30, 1936, with the Warehouse Corporation for the fulfillment of the contract of June 12, 1936, and in which contract of November 7 the Warehouse Corporation did transfer, convey, assign, and deliver to the Grain Corporation all of its assets as of June 30, 1936. This instrument affirmatively shows that the conveyance was made by the Warehouse Corporation to the Grain Corporation for the expressed purpose of carrying out the contract of the Grain Corporation to the United States of June 12, 1936, and for the consideration that would flow to each of the companies under said agreement of June 12, 1936. Even if the Grain Corporation had thereafter refused to execute a formal deed to the United States, a court of equity would have decreed it to have acquired the property for the United States, in fulfillment of its contract with the United States, and, therefore, it would be held to be a trustee for the United States of the legal title.

The majority opinion states that: "The record contains no evidence to establish that the United States or any of its agencies have yet performed the contractual obligations undertaken by it. Under such circumstances a court of equity has no power to compel performance until the one demanding it has matured his right thereto by performance or a tender of performance of all conditions precedent to the creation of an equitable right in him."

Who is seeking a Court to compel performance? Not the parties to the agreements. Who raises the question of any failure on the part of the United States to perform? Not the parties to the agreement. The Tax Collector never raised it. The authority of the majority of this Court to raise it is gravely questioned. The record does not contain a vestige of evidence even tending to show lack of performance by the United States of its obligations, or tender of performance, before January 1, 1937.

But the record does show that the United States leased the property back to the Grain Corporation and the Warehouse Corporation in turn leased it back from the Grain Corporation and paid to the United States $414.08 rental per month from June 30, 1936, thenceforth. The leasing back of this property was one of the obligations which the United States agreed to perform which it did perform. It would seem most unusual for a corporation to pay rental of $414.08 per month for the use of its own

---

[1] In Volume 19 C. J. S., Corporations, page 472, § 1004, it is said: "* * * but the trend of authority is to uphold as binding on the corporation acts or contracts on its behalf by a person or persons owning all or practically all the stock, even though there is a lack of, or defect in, some corporate step or action."

Numerous cases are cited in support of the text, including the case of Computing Scale Company v. Toledo Computing Scale Company, 7 Cir., 279 F. 648, holding that the assignment of a patent in the name and on behalf of a corporation by all of its stockholders conveyed at least a full equitable title.

property, or to its contractee if the contractee was in substantial default in its obligation to the corporation. These facts create a presumption, in the absence of evidence to the contrary, of no lack of performance by the United States. When the deed of February 24, 1937, was executed, why was it executed "as of October 31, 1936", if the United States had not carried out its part of the bargain as of that date?

Even if we were to consider the sole stockholder as having acted without authority to act for the Warehouse Corporation, we find that the Warehouse Corporation not only ratified the acts of its agent by subsequently making a deed in conformity with the agreement of its agent, but it also, on November 7, 1936, accepted a lease back from the Grain Corporation, which in turn had secured and accepted a lease from the United States to the premises. Thus by: (a) its acceptance of the lease, (b) its attornment under the lease, and (c) its ratification of the entire agreement by its parent, it would be estopped to question the authority of the Grain Corporation to make the contract. The Grain Corporation, by virtue of: (a) its contract, (b) the fact that it obtained the deed from the Warehouse Corporation for the purpose of carrying out its contract with the Government, (c) its covenant with the Government to acquire the property for the Government, and (d) its attornment to the United States, would likewise be estopped to assert title against the Government, either legal or equitable, and, whether or not its after-acquired title inured to the United States, it at least was a trustee of the legal title for the United States with the equitable or beneficial title in the United States.

After the Grain Corporation contracted with the United States to cause its subsidiaries to convey to the United States, and to perform such other acts as were necessary to accomplish the purposes of the agreement, and after its acquisition of a deed from the Warehouse Corporation "in fulfillment" of its contract to the United States, equity might properly consider the title as having inured to the benefit of its contractee so as to create an equitable title by estoppel.

No one disputes that unrecorded and unacknowledged deeds are void, in Texas, as to innocent purchasers and creditors, but such instruments are binding on the parties thereto,[2] and most assuredly must that be so when the parties have asserted no invalidity, and when there is no innocent purchaser, and when a tax obligation in Texas does not create the relation of debtor and creditor. The Tax Collector is not a creditor for a valuable consideration without notice, because the assessment is against the property and not the owner, and contracts of the owner do not affect taxes.

In view of the fact, therefore, that the equitable title was in the United States, the lands were not subject to taxation on January 1, 1937, and the Court below should have granted the injunction sought and decreed the lien of the several taxing units to be void.

The Judgment below should be reversed, set aside, and vacated, with directions to the Court below to enter Judgment for the Plaintiff.

---

[2] Article 6627 of the Texas Revised Civil Statutes reads as follows: "All bargains, sales and other conveyances whatever, of any land, tenements and hereditaments, whether they may be made for passing any estate of freehold of inheritance or for a term of years; and deeds of settlement upon marriage, whether land, money or other personal thing; and all deeds of trust and mortgages shall be void as to all creditors and subsequent purchasers for a valuable consideration without notice, unless they shall be acknowledged or proved and filed with the clerk, to be recorded as required by law; but the same as between the parties and their heirs, and as to all subsequent purchasers, with notice thereof or without valuable consideration, shall be valid and binding."